**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Scott Powers, individually, as Representative of the Estate of Erika Zak, and as the natural guardian of L.P., a minor, <br><br> Plaintiff, <br><br> vs. <br><br> Constantinos Sofocleous and Memorial Sloan Kettering Cancer Center, <br><br> Defendants. | Civil Action No.: <br> 1:20-cv-02625 (LGS) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Andrew S. Kaufman
Betsy D. Baydala
KAUFMAN BORGEEST & RYAN LLP
120 Broadway, 14th Floor
New York, NY 10271
Telephone: (212) 980-9600
Fax: (212) 980-9291
akaufman@kbrlaw.com
bbaydala@kbrlaw.com

## TABLE OF CONTENTS

STATEMENT OF FACTS ……………………………………………………..   1

LEGAL STANDARD ……………………………………………………   8

GOVERNING SUBSTANTIVE LAW ……………………………………..   9

    ELEMENTS OF MEDICAL MALPRACTICE ………………………….   9

    ELEMENTS OF LACK OF INFORMED CONSENT ………………………..   10

    ELEMENTS OF WRONGFUL DEATH ……………………………………   10

    DAMAGES ……………………………………………………………   11

ARGUMENT ……………………………………………………………..   12

    POINT I:    THE DEFENDANTS' CARE AND TREATMENT
        OF MS. ZAK IN MARCH/APRIL 2017 FULLY
        CONFORMED WITH THE STANDARDS OF CARE ……….   12

        A)  Plaintiff has no expert support for his claims that Ms. Zak's
        case should have been presented to a multidisciplinary tumor
        board prior to the ablation or that Memorial should have
        required such protocols. ………………………………………….   12

        B)  Plaintiff's claim that an alternative to ablation should have been
        performed must be dismissed. ……………………………………   12

        C)  There are no viable claims of malpractice against Dr. Kemeny. ……   13

        D)  Dr. Sofocleous' decision to proceed with ablation was within
        the standard of care. …………………………………………….   14

        E)  Dr. Sofocleous performed the ablation in accordance with
        the standards of care. ……………………………………………..   15

    POINT II:    THERE IS NO CAUSAL NEXUS BETWEEN THE
        ABLATION AND MS. ZAK'S ALLEGED LIVER
        DAMAGE LEADING TO LIVER FAILURE AND
        HER DEATH …………………………………………………   17

    POINT III:    PLAINTIFF CANNOT CLAIM LACK OF INFORMED
        CONSENT AGAINST MEMORIAL …………………………..   20

7529679

POINT IV:   DR. SOFOCLEOUS PROPERLY OBTAINED
            INFORMED CONSENT FROM MS. ZAK  …………………   21

POINT V:    THERE IS NO EVIDENCE TO SUPPORT A CLAIM
            OF NEGLIGENT HIRING OR NEGLIGENT SUPERVISION ...  23

POINT VI:   THERE IS NO EVIDENCE TO SUPPORT A CLAIM OF
            SPOLIATION ……………………………………………   23

POINT VII:  PLAINTIFF CANNOT RECOVER CERTAIN DAMAGES
            SOUGHT …………………………………………………   23

        A)  Plaintiff seeks damages that are not recoverable under
            New York Law. ……………………………………………   23

        B)  Plaintiff cannot satisfy his burden of proof for
            past and future lost earnings. …………………………………   24

        C)  Plaintiff cannot satisfy his burden of proof for
            loss of household services. …………………………………   24

        D)  Plaintiff cannot satisfy his burden of proof for
            recovery of funeral expenses. …………………………………   25

CONCLUSION …………………………………………………………………..  25

7529679

TABLE OF AUTHORITIES

**Cases**

Alvarez v. Prospect Hosp.,
68 N.Y.2d 320, 501 N.E.2d 572 (1986) ……………………………………………………   9

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ………………………………………………………………………..   8

Bank of New York v. Amoco Oil Co.,
35 F.3d 643 (2d Cir. 1994) ………………………………………………………………   9

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ………………………………………………………………………..   8

Coolidge v. U.S.,
No. 10-CV-363S, 2020 WL 3467423 (W.D.N.Y. Jun. 25, 2020) …………………………   11

De Angelis v. Lutheran Med. Ctr.,
84 A.D.2d 17 (2d Dept. 1981), aff'd 58 N.Y.2d 1053 (1983) ……………………………   24

Dershowitz v. U.S.,
No. 12-CV-08634 (SN), 2015 WL 1573321 (S.D.N.Y. Apr. 8, 2015) …………………...   11, 24

Dineen ex rel. Dineen v. Stramka,
228 F.Supp.2d 447 (S.D.N.Y. 2002) ……………………………………………………..   11

Erie R. Co. v. Tompkins,
304 U.S. 64, 58 S.Ct. 817 (1938) ………………………………………………………   9

Faulk v. NYC Dept. of Corrections,
No. 08 Civ. 01668 (LGS), 2014 WL 239708 (S.D.N.Y. Jan. 1, 2014) ……………………   8

Finney v. Morton,
170 A.D.3d 811, 95 N.Y.S.3d 566 (2d Dept. 2019) ………………………………………25

Glowczenski v. Taser Intern. Inc.,
594 Fed.Appx. 723 (2d Cir. 2014) (summary order) ……………………………………11

Good v. Presbyterian Hosp. in City of New York,
934 F.Supp. 107 (S.D.N.Y. 1996) ………………………………………………………10

Hegger v. Green,
646 F.2d 22 (2d Cir. 1981) ……………………………………………………………...9

7529679

Hicks v. Baines,
593 F.3d 159 (2d Cir. 2010) ………………………………………………….. 8

Hoemke v. New York Blood Center,
No. 88 Civ. 9029 (RO), 1898 WL 147642 (S.D.N.Y. Nov. 28, 1989) …………………… 20

I.M. v. United States,
362 F.Supp.3d 161 (S.D.N.Y. 2019) …………………………………………………… 10

Idowu v. Middleton,
No. 12 Civ. 01238(LGS), 2013 WL 4780042 (S.D.N.Y. Aug. 5, 2013) ………………… 9

Jaquez v. Flores,
No. 10 Civ. 2881 (KBR), 2016 WL 1267780 (S.D.N.Y. Mar. 30, 2016) ………………… 10

Kavazanjian v. Rice,
No. 03 Civ. 1923, 2008 WL 5340988 (E.D.N.Y. Dec. 22, 2008) ………………………… 17

Klos v. NYC Transit Auth.,
240 A.D.2d 635, 659 N.Y.S.2d 97 (2d Dept. 1997) …………………………………… 11

Lesane v. U.S.,
No. 16 Civ. 3049 (LSG), 2018 WL 3329854 (S.D.N.Y. Jul. 6, 2018) …………………… 8

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
475 U.S. 574 (1986) …………………………………………………………………… 9

Ongley v. St. Lukes Roosevelt Hospital Center,
725 Fed.Appx. 44 (2d Cir. 2018) ……………………………………………………… 9

Orphan v. Pilnik,
15 N.Y.3d 907, 940 N.E.2d 555 (2010) ……………………………………………… 10

Pagan v. City of New York,
No. 15-CV-05825 (LDH)(RLM), 2019 WL 8128482 (Mar. 28, 2019) …………………... 11

Schultz v. Harrison Radiator Div. Gen. Motors Corp.,
90 N.Y.2d 311, 683 N.E.2d 307 (1997) ……………………………………………... 11

Smith v. Masterson,
353 Fed.Appx. 505 (2d Cir. 2009) …………………………………………………..  8

Sousa v. Marquez,
702 F.3d 124 (2d Cir. 2012) …………………………………………………………… 8

iv

Sugarman v. Equinox Holding Inc.,
73 A.D.3d 654, 901 N.Y.S.2d 615 (1st Dept. 2010) …………………………………… 23

Vale v. United States of America,
673 Fed.Appx. 114 (2d Cir. 2016) ………………………………………………... 9

Walton v. Lee,
No. 15 Civ. 3080 (PGG), 2019 WL 1437912 (S.D.N.Y. Mar. 29, 2019) ……………… 17

West v. Goodyear Tire & Rubber Co.,
167 F.3d 776 (2d Cir. 1999) ……………………………………………………… 23

Wills v. Amerada Hess Corp.,
379 F.3d 32 (2d Cir. 2004) ………………………………………………………... 10

**Statutes**

28 U.S.C. §1652 ……………………………………………………………….. 9

N.Y. EPTL §5-4.3 …………………………………………………………... 11

N.Y. Pub. Health Law, §2805-d ……………………………………………….. 10, 20

N.Y. Pub. Health Law, §2805-d(1) …………………………………………….. 10

**Rules**

Fed. R. Civ. P. 56 …………………………………………………………… 1, 8

CPLR §5002 …………………………………………………………………… 24

7529679

Defendants, Memorial Hospital for Cancer and Allied Diseases s/h/a Memorial Sloan Kettering Cancer Center ("Memorial") and Constantinos Sofocleus, M.D. s/h/a Constantinos Sofocleous ("Dr. Sofocleous") (collectively "Defendants"), by their attorneys, Kaufman Borgeest & Ryan LLP, respectfully submit this memorandum of law in support of Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.

## STATEMENT OF FACTS

This is a diversity action alleging causes of action for medical malpractice, lack of informed consent and wrongful death.  According to Plaintiff's Complaint, Dr. Sofocleous committed medical errors during a liver ablation procedure performed on the decedent, Erika Zak ("Ms. Zak"), on April 10, 2017.[1]  Plaintiff claims the ablation catastrophically damaged Ms. Zak's liver causing protracted liver failure and a liver transplant to save her life.[2]  On August 23, 2019, 2.5 years after the ablation, Ms. Zak died during liver transplant surgery at Cleveland Clinic and Plaintiff claims wrongful death.[3]  Plaintiff also asserts a cause of action for lack of informed consent claiming Dr. Sofocleous did not advise Ms. Zak of the alternatives or reasonably foreseeable risks and complications of the ablation.[4]

In early January 2014, Ms. Zak gave birth to her daughter.[5]  While on maternity leave, in April 2014, Ms. Zak was diagnosed with very advanced, metastatic colon cancer involving her liver and pelvis.[6]  Her expected survival was two years.[7]  From May to August 2014, Ms. Zak

---

[1] See Declaration of Betsy D. Baydala ("the Baydala Declaration"), Exhibit ("Ex.") A, ¶¶8-9. All exhibits referenced herein are annexed to the Baydala Declaration accompanying the Defendants' motion for summary judgment.
[2] Id.
[3] Id. at ¶¶22 and 40.
[4] Id. at ¶¶33-34.
[5] See Ex. C, p. 2.
[6] See Ex. C, pp. 1, 3 and 5-6.
[7] See Ex. N, p. 8 (T.113:3-6).

underwent a recommended course of systemic chemotherapy with Dr. Andrew Ko at University of California San Francisco ("UCSF").[8]

While living in California, Ms. Zak sought out the treatment option of a hepatic artery infusion ("HAI") pump that administers higher concentrations of chemotherapy directly to the liver, which was offered by medical oncologist, Dr. Nancy Kemeny, at Memorial.[9]   On September 11, 2014, Ms. Zak underwent surgery at Memorial to remove all the known non-liver sites of cancer, and the HAI pump was inserted by surgeon, Dr. Ronald DeMatteo.[10]   Surgical pathology demonstrated sites of metastasis outside the colon and the liver, which suggested that Ms. Zak's disease was incurable even if it could be controlled in the liver.[11]   Ms. Zak's high disease burden and extrahepatic disease were poor prognostic factors.[12]

Following surgery, Ms. Zak was to receive liver-directed Floxuridine ("FUDR") chemotherapy through the HAI pump concurrently with systemic FOLFIRI chemotherapy every two weeks.[13]   Prior to initiating FUDR HAI pump treatment on September 24, 2014, Ms. Zak was informed of the risk of liver toxicity, which risk would be monitored by her liver function tests ("LFTs") and modifying or stopping FUDR as needed.[14]   FUDR is toxic to the liver and causes damage to the biliary system.[15]   Dr. Kemeny reduced Ms. Zak's second dose of FUDR, held her third dose of FUDR, and further reduced Ms. Zak's FUDR dose when it resumed on February 4, 2015 because she had elevated LFTs (ALT, AST and ALK values).[16]   In an effort to reach a possible point of resection of the liver metastases, on April 1, 2015, Dr. Kemeny

---

[8] See Ex. C, pp. 5-6; Ex. D, p. 6.
[9] See Ex. H, p. 4 (T.63:5-11).
[10] See Ex. C, pp. 8-9.
[11] See Ex. C, pp. 10-11; Ex. FF, p. 3.
[12] See Ex. N, pp. 5-6 (T.110:9-111:25).
[13] See Ex. C, pp. 12-13.
[14] See Ex. C, pp. 14-15; Ex. P, p. 1 (T.8:2-11).
[15] See M, p. 10 (T.47:3-9).
[16] See Ex. C, pp. 16-17; Ex. D, pp. 1-2.

increased the FUDR dose and added Mitomycin, but Ms. Zak was unable to tolerate it, resulting in reduction of the Mitomycin dose and FOLFIRI.[17]   In July 2015, Dr. Ko eliminated Irinotecan from every other cycle of FOLFRI and Dr. Kemeny dose reduced FUDR.[18]

In November 2015, Ms. Zak moved back home to Oregon where her parents were and transferred her local care from UCSF to Oregon Health & Science University ("OHSU").[19]   At that time, Ms. Zak met with a Social Worker at OHSU and reported that her husband, who was not working, helped care for her and her young daughter.[20]   In December 2015, Ms. Zak reported to the OHSU Social Worker that days after receiving chemotherapy she felt poorly and stayed at home; she was suffering from significant anxiety and depression.[21]

On March 21, 2016, a PET/CT scan demonstrated new or re-emergent metastasis in the liver and surgery was scheduled with Dr. DeMatteo to remove the PET avid tumor.[22]   Ms. Zak agreed to go forward with surgery despite Dr. DeMatteo advising that things could go very wrong during surgery with a small chance of death and despite being told the tumor was in a very difficult location near the trunk of the right hepatic vein.[23]   On March 24, 2016, Dr. DeMatteo performed a "very difficult" operation to resect the tumor right behind the right hepatic vein; he also performed ultrasound-guided surgical ablations of two liver lesions.[24]   The surgery was complicated by a biloma collection requiring drainage.[25]

On June 22, 2016, Dr. Kemeny told Ms. Zak "So you know, all of these things I am giving in the liver could eventually hurt your liver", and Ms. Zak was aware that if her liver

---

[17] See Ex. D., pp. 3-5.
[18] See Ex. D, pp. 7-8.
[19] See Ex. H, p. 1 (T.17:18-24); Ex. D, p. 9.
[20] See Ex. D, p. 9.
[21] See Ex. D, p. 10.
[22] See Ex. E, pp. 1-2.
[23] See Ex. O, p. 14 (T.158:2-15); Ex. E, p. 3.
[24] See Ex. E, p. 4; Ex. O, pp. 10 and 18 (T.120:18-22 and T.238:21-24).
[25] See Ex. E, p. 5.

became "taxed" she could develop cirrhosis.[26]  Since Ms. Zak's liver enzymes were slightly elevated, Dr. Kemeny further dose reduced FUDR on June 22, 2016.[27]

Five months after surgery, on August 16, 2016, Ms. Zak suffered her second recurrence with a new liver metastasis, which was another poor prognostic factor.[28]  Dr. Kemeny discussed these findings with Ms. Zak on August 17, 2016, and referred her to Dr. Sofocleous for evaluation of an ablation.[29]  On August 19, 2016, Ms. Zak met with Dr. Sofocleous, an interventional radiologist specialized in interventional oncology at Memorial.[30]  Dr. Sofocleous informed Ms. Zak that he could ablate the tumor and he discussed the risks of ablation, including but not limited to, injury to the liver and bile ducts, and biloma or abscess requiring prolonged drainage.[31]  Prior to the start of the ablation on August 29, 2016, Dr. Sofocleous had another discussion with Ms. Zak and, again, discussed the risk of injury to the bile duct that might require a stent.[32]  Ms. Zak agreed to go forward with the ablation, which was successfully performed on August 29, 2016.[33]  On a third occasion, during a follow-up visit on November 30, 2016, Dr. Sofocleous discussed the ablation risk of injury to the bile duct with Ms. Zak.[34]

After the August 2016 ablation, Ms. Zak received one more dose of FUDR on October 5, 2016, which proved to be her final dose of FUDR because the treatment was affecting her liver with worsening LFTs.[35]  Ms. Zak received heparin/dexamethasone in her HAI pump in an effort to minimize biliary sclerosis.[36]

---

[26] See Ex. L, pp. 1 and 4 (T.13:12-21 and T.63:9-13); Ex. U at 3:48 and 4:41.
[27] See Ex. E, pp. 6-7.
[28] See Ex. E, p. 8; Ex. N, p. 7 (T.112:19-24).
[29] See Ex. E, p. 9.
[30] See Ex. E, pp. 10-11.
[31] See Ex. E, pp. 10-12.
[32] See Ex. H, pp. 5-9 (T.103:11-104:10 and T.107:15-109:3-10).
[33] See Ex. E, pp. 12-13.
[34] See Ex. L, pp. 2-3 (T.43:4-44:21).
[35] See Ex. E, pp. 14-18; Ex. F, p. 1; Ex. P, p. 2 (T.16:12-15).
[36] See Ex. E, p. 18.

On March 21, 2017, a PET/CT scan detected Ms. Zak's third recurrence in less than one year with two new metastatic liver lesions.[37]   On March 22, 2017, Ms. Zak, accompanied by her sister-in-law Chloe Metz, presented to Dr. Kemeny, who told Ms. Zak of the new lesions and that she wanted to discuss possible ablation with Dr. Sofocleous.[38]   Dr. Kemeny explained to Ms. Zak, who was very tired of chemotherapy, that the chemotherapy was no longer working because lesions were continuing to grow.[39]   After speaking with Dr. Sofocleous, Dr. Kemeny referred Ms. Zak to him for evaluation of ablation.[40]   That day, Ms. Zak met with Dr. Sofocleous as a consent visit for the ablation.[41]   Dr. Sofocleous explained to Ms. Zak that when performing the ablation, he would burn whatever lit up on the PET scan provided it was safe.[42]   Dr. Sofocleous informed Ms. Zak that the risks of ablation were bleeding, infection, injury to the bile duct, and injury to liver/lung.[43]   Ms. Zak asked whether the lesion was near her bile duct and Dr. Sofocleous twice explained to Ms. Zak, while pointing out the lesion on imaging, that it was near the bile duct.[44]   Ms. Zak was given the opportunity to, and indeed did, ask Dr. Sofocleous a number of questions, which Dr. Sofocleous answered.[45]   Ms. Zak was glad ablation was not surgery and signed the consent form for ablation.[46]   Ms. Zak agreed to go forward with the ablation so she could improve her chances of staying alive.[47]

---

[37] See Ex. F, p. 2.
[38] See Ex. I, pp. 1-2 (T.11:22-12:7); Ex. J, p. 1 (T.2:11-18).
[39] See Ex. J, pp. 1-2 (T.2:24-3:4); Ex. I, pp. 4-6 (T.47:22-48:9 and T.70:7-13).
[40] See Ex. J, p. 2 (T.3:4-23); Ex. F, p. 5.
[41] See Ex. F, p. 5.
[42] See Ex. K, p. 1 (T.2:7-17).
[43] See Ex. Q, pp. 6-7 and 13 (T.105:23-106:12 and T.134:6-10); Ex. F, p. 6.
[44] See Ex. K, pp. 1-2 and 4-7 (T.2:22-3:4, T.5:23-6:5 and T.7:23-8:7).
[45] See Ex. K, pp. 2-4 and 9-12 (T.3:14-5:22, T.14:13-23, T.15:8-16:15, T.16:24-17:12).
[46] See Ex. H, pp. 10-11 (T.119:11-120:8); Ex. F, p. 6.
[47] See Ex. L, p. 5 (T.111:11-17).

On April 10, 2017, Dr. Sofocleous performed PET/CT-guided percutaneous microwave ablations of Ms. Zak's two liver lesions.[48]  Dr. Sofocleous performed two overlaps and used two probes to ablate each lesion.[49]  Dr. Sofocleous documented a summary of his total time ablated as 20 minutes for each tumor and a range of wattage as 40 to 60 Watts.[50]  At the end of the ablation, Dr. Sofocleous performed a PET scan and he noted diminished flow in the left and main portal vein, and he reported this complication to Plaintiff.[51]

Immediately after the ablation, Ms. Zak's LFTs demonstrated acute liver damage, but by April 24, 2017, her liver function levels had recovered to her pre-ablation abnormal baseline.[52] By April 11, 2017, the left portal vein remained thrombosed, but a collateral (side branch) vessel demonstrated portal venous flow with reperfusion of the liver taking place.[53]  The ablation caused a severe bile duct injury and subsequent biloma formation requiring stenting with the first drain placed on April 14, 2017.[54] Ms. Zak returned home to Oregon after her discharge from Memorial on May 2, 2017.  On May 16, 2017, OHSU recommended conservatively treating Ms. Zak with scanning of the biloma for monitoring of possible progression.[55]  On June 26, 2017, a CT scan showed a decreased central biloma and multiple collaterals formed after the left portal vein thrombosis.[56]

On July 4, 2017, Ms. Zak's hepatic artery started bleeding just distal to the HAI pump in the gastroduodenal artery requiring embolization.[57]  The imaging showed no portal bleeding with

---

[48] See Ex. F, pp. 7-8.
[49] See Ex. F, p. 7.
[50] See Ex. F, p. 7; Ex. Q, p. 14 (T.155:2-5).
[51] See Ex. F, p. 8; Ex. H, pp. 12-13 (T.132:10-133:6).
[52] See Ex. EE, pp. 4-8 (T.48:12-20, T.49:11-17; T.50:9-19; T.52:5-7, T.76:12-14, T.76:21-24).
[53] See Ex. F, pp. 9-10.
[54] See Ex. F, pp. 14-15.
[55] See Ex. F, p. 15.
[56] See Ex. F, p. 16.
[57] See Ex. F, p. 18.

intrahepatic portal collaterals reperfusing the liver.[58]   On August 7, 2017, a PET scan was concerning for metastatic disease in segment 5 of the liver, and, in October 2017, Ms. Zak was started on Pembro.[59]

Months after the ablation, in December 2017, Dr. Kemeny told Plaintiff that Cleveland Clinic was beginning to do liver transplants on patients, including patients with biliary sclerosis from pump treatment.[60]   In December 2017, Ms. Zak was evaluated at Cleveland Clinic for an experimental liver transplant protocol for patients with metastatic colon cancer to only the liver.[61]   Cleveland Clinic approved Ms. Zak for the liver transplant list on February 1, 2018; she moved to Cleveland Clinic in June 2018.[62]   On June 7, 2018, Dr. Robert Pelley at Cleveland Clinic noted that Ms. Zak's "liver dysfunction is all secondary to complications of her chemotherapy and surgeries as well as her tumor."[63]   On August 22, 2019, a donor liver became available for Ms. Zak and she was taken to transplant surgery, but she died during surgery due to cardiopulmonary failure.[64]   According to Cleveland Clinic's pathologist, Ms. Zak's explanted liver was "consistent with end stage liver disease (cirrhosis)" and "could be associated with chemotherapy-induced liver injury and superimposed complications of cirrhosis."[65]

---

[58] See Ex. F, p. 18.
[59] See Ex. F, p. 21; Ex. H, p. 14 (T.228:9-12).
[60] See Ex. P, pp. 14-15 (T.192:11-193:2).
[61] See Ex. DD, p. 1; Ex. G, p. 1.
[62] See Ex. H, pp. 2 and 15 (T.18:15-21 and T.247:2-6).
[63] See Ex. G, p. 1.
[64] See Ex. H, p. 18 (T.275:8-25); Ex. B, p. 2.
[65] See Ex. G, p. 3.

## LEGAL STANDARD

Summary judgment is appropriate where the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Sousa v. Marquez, 702 F.3d 124, 127 (2d Cir. 2012). "The moving party bears the initial burden of informing the court of the basis for the summary judgment motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact." Faulk v. NYC Dept. of Corrections, No. 08 Civ. 01668 (LGS), 2014 WL 239708, *3 (S.D.N.Y. Jan. 1, 2014). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"If the non-moving party has the burden of proof on a specific issue, the moving party may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim." Faulk, supra, at *4. "If the moving party caries its initial burden, then the non-moving party bears the burden of demonstrating a genuine issue of material fact." Id. "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Lesane v. U.S., No. 16 Civ. 3049 (LSG), 2018 WL 3329854, *5 (S.D.N.Y. Jul. 6, 2018) citing Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010). "Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Id. "To demonstrate an issue of material fact, [the plaintiff] must point to more than a 'scintilla' of evidence in support of his position." Smith v. Masterson, 353 Fed.Appx. 505, 507 (2d Cir. 2009) (internal citations omitted). "The nonmoving party must do more than simply show that there is some

metaphysical doubt as to the material facts." Idowu v. Middleton, No. 12 Civ. 01238(LGS), 2013 WL 4780042, at *5 (S.D.N.Y. Aug. 5, 2013) citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

### GOVERNING SUBSTANTIVE LAW

Federal Courts in diversity jurisdiction will apply the law of the forum state on outcome determinative issues. 28 U.S.C. §1652; Erie R. Co. v. Tompkins, 304 U.S. 64, 80, 58 S.Ct. 817, 823 (1938); Bank of New York v. Amoco Oil Co., 35 F.3d 643, 650 (2d Cir. 1994).

### ELEMENTS OF MEDICAL MALPRACTICE

"In order to prevail in a medical malpractice claim in New York, … a plaintiff must establish '(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries. These elements must be established by expert testimony, unless the testimony is within the ordinary knowledge and experience of the jury." Vale v. United States of America, 673 Fed.Appx. 114, 116 (2d Cir. 2016) (internal citations omitted). "[U]nder New York law, a plaintiff in a medical malpractice action must produce medical testimony to establish the proper standard of care." Hegger v. Green, 646 F.2d 22, 29 (2d Cir. 1981). "A medical malpractice defendant is *prima facie* entitled to summary judgment if it demonstrates that it did not depart from good and accepted medical practices or that any departure did not proximately cause plaintiff's injuries." Ongley v. St. Lukes Roosevelt Hospital Center, 725 Fed.Appx. 44 (2d Cir. 2018) (internal citation omitted). "General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, and insufficient to defeat" a defendant's *prima facie* summary judgment motion. Alvarez v. Prospect Hosp., 68 N.Y.2d 320, 325, 501 N.E.2d 572, 574 (1986). When a plaintiff cannot prevail on a claim of medical malpractice

against the defendant doctor, the plaintiff's claims against the hospital for vicarious liability must also be dismissed.  Good v. Presbyterian Hosp. in City of New York, 934 F.Supp. 107, 112 (S.D.N.Y. 1996).

## ELEMENTS OF LACK OF INFORMED CONSENT

To establish a cause of action asserting lack of informed consent, a plaintiff must prove that "(1) the practitioner failed to disclose the risks, benefits and alternatives to the procedure or treatment that a reasonable practitioner would have disclosed and (2) a reasonable person in plaintiff's position, fully informed, would have elected not to undergo the procedure or treatment." Orphan v. Pilnik, 15 N.Y.3d 907, 908, 940 N.E.2d 555 (2010) citing N.Y. Pub. Health Law, §2805-d.  A practitioner must conduct this disclosure "as a reasonable medical practitioner … under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation." N.Y. Pub. Health Law, §2805-d(1).  "Expert medical testimony is required to prove the insufficiency of the information disclosed to the [patient]." Orphan, *supra* at 908.  A plaintiff must also prove that the lack of informed consent is a proximate cause of the injury or condition for which recovery is sought.  I.M. v. United States, 362 F.Supp.3d 161, 203 (S.D.N.Y. 2019).

## ELEMENTS OF WRONGFUL DEATH

New York law requires a plaintiff in a wrongful death action to prove "a wrongful act, neglect or default of the defendant that caused the decedent's death." Jaquez v. Flores, No. 10 Civ. 2881 (KBR), 2016 WL 1267780, *2 (S.D.N.Y. Mar. 30, 2016) (internal quotations and citations omitted).  Where "the nexus between the injury and the alleged cause would not be obvious to the lay juror, expert evidence is often required to establish the causal connection." Wills v. Amerada Hess Corp., 379 F.3d 32, 46 (2d Cir. 2004) (internal quotation and citations

omitted).  Where a plaintiff fails to prove a sufficient causal or proximate nexus the wrongful death claim must be dismissed.  See Dineen ex rel. Dineen v. Stramka, 228 F.Supp.2d 447, 454 (S.D.N.Y. 2002); see also Glowczenski v. Taser Intern. Inc., 594 Fed.Appx. 723, 725 (2d Cir. 2014) (summary order) (affirming grant of summary judgment in favor of the defendant for the wrongful death claim because the plaintiff had no expert as to cause of death); Pagan v. City of New York, No. 15-CV-05825 (LDH)(RLM), 2019 WL 8128482, *6 (Mar. 28, 2019) (same).

## DAMAGES

"The standard by which to measure the value of past and future lost earnings is the decedent's gross income at the time of death, and the standard by which to measure the value of past and future loss of household services is the cost of replacing the decedent's services."  Klos v. NYC Transit Auth., 240 A.D.2d 635, 637, 659 N.Y.S.2d 97, 99 (2d Dept. 1997) (internal citations omittedd).  The Court is permitted to not award past and future lost earnings "when they are based on contingencies which are uncertain, dependent on future changeable events and, thus, inherently speculative."  Dershowitz v. U.S., No. 12-CV-08634 (SN), 2015 WL 1573321, *32 (S.D.N.Y. Apr. 8, 2015) (internal quotations and citations omitted).  "[F]uture damages for loss of household services should be awarded only for those services which are reasonably certain to be incurred and necessitated by plaintiff's injury."  Schultz v. Harrison Radiator Div. Gen. Motors Corp., 90 N.Y.2d 311, 321, 683 N.E.2d 307 (1997).  "To recover for these household services, a plaintiff needs to present evidence of actual expenditure incurred (or likely to be incurred) to replace these services."  Coolidge v. U.S., No. 10-CV-363S, 2020 WL 3467423, *41 (W.D.N.Y. Jun. 25, 2020).  A wrongful death plaintiff is entitled to recover "the reasonable funeral expenses of the decedent paid by the distributees."  N.Y. EPTL §5-4.3.

**ARGUMENT**

**POINT I**

**THE DEFENDANTS' CARE AND TREATMENT OF MS. ZAK IN MARCH/APRIL 2017 FULLY CONFORMED WITH THE STANDARDS OF CARE**

    A) **Plaintiff has no expert support for his claims that Ms. Zak's case should have been presented to a multidisciplinary tumor board ("MDTB") prior to the ablation or that Memorial should have required such protocols.**

Ms. Zak's treating doctors (Dr. Mayo and Dr. Lopez) and Plaintiff's experts (Dr. DeMatteo and Dr. Navuluri) agreed that presenting Ms. Zak's case to a MDTB prior to the ablation was not mandatory or required by the standard of care.[66]  In addition, none testified that not presenting Ms. Zak's case to a MDTB prior to the ablation was a departure from the standard of care.  Indeed, the evidence demonstrates that most oncologic patients are not presented to a MDTB prior to any particular treatment.[67]  It is standard medical practice for an oncologist to refer a patient directly to an interventional oncologist to assess for advisability of local therapy, which is what occurred when Dr. Kemeny referred Ms. Zak to Dr. Sofocleous in March 2017.[68]

    B) **Plaintiff's claim that an alternative to ablation should have been performed must be dismissed.**

Ablation was the standard of care and best option in March/April 2017; any other alternative to ablation was not appropriate, feasible or was inferior to ablation.  The evidence demonstrates that upon Dr. Kemeny referring Ms. Zak to Dr. Sofocleous, the non-interventional radiology alternatives under the National Comprehensive Cancer Network ("NCCN") guidelines for treatment of metastatic colon cancer – namely, surgery and chemotherapy – had been ruled out.  In March 2017, Ms. Zak was failing chemotherapy as it was her third recurrence in 12

---

[66] See Ex. M, p. 3 (T.22:2-25); Ex. N, p. 4 (T.107:2-8); Ex. O, p. 15 (T.214:2-19); Ex. R, p. 4.
[67] See Ex. M, p. 11 (T.106:12-24).
[68] See Ex. N, p. 4 (T.107:2-8); Ex. R, pp. 2-4; Ex. FF, pp. 4-5.

months.[69]  Ms. Zak was also suffering from the cumulative and toxic effects of having undergone chemotherapy for nearly three years.  Plaintiff's expert, Dr. DeMatteo, testified that Dr. Kemeny was in the best position to determine whether additional or different chemotherapy would have been appropriate in March/April 2017.[70]  As Defendants' medical oncology expert, Dr. Rubinson, opined, any alternative chemotherapy regimen was an inferior option to local directed therapy, such as ablation, which offered the chance of complete eradication of the two new metastatic lesions.[71]  In addition, there is no expert opinion from a surgeon that surgery was a viable, appropriate or effective treatment option for Ms. Zak in March/April 2017.[72]  Plaintiff's expert, Dr. Navuluri, testified that under the authoritative NCCN guidelines, ablation was the next, best and most effective treatment option after chemotherapy and surgery.[73]

Moreover, the evidence demonstrates, and Plaintiff's experts have not refuted, that other potential alternatives, such as radiation, radiation segmentectomy, and irreversible electroporation, were not the standard of care in March/April 2017 and were inferior options to ablation.[74]  Pembro was also not a viable option in March/April 2017 because it was not FDA approved.[75]  Additionally, Ms. Zak was not believed to be MSI-high and, therefore, the chance of a response to Pembro was unlikely.[76]

### C) There are no viable claims of malpractice against Dr. Kemeny.

The only conceivable claims against Dr. Kemeny are that she should have presented Ms. Zak's case to a MDTB prior to the April 10, 2017 ablation, and that she should have

---

[69] See Ex. P, p. 3 (T.17:14-24).
[70] See Ex. O, p. 16 (T.226:21-25).
[71] See Ex. FF, pp. 1-3.
[72] See Ex. O, p. 6 (T.90:5-17).
[73] See Ex. S, pp. 8-9 and 16 (T.87:19-88:6 and errata letter).
[74] See Ex. S, p. 10 (T.90:17-22) and Ex. W, p. 2 (regarding radiation segmentectomy); see Ex. W, p. 2; Ex. X, p. 3 (T.120:6-19) (regarding radiation); see Ex. Z, pp. 5-7 (T.70:24-71:21 and T.72:11-16) (regarding irreversible electroporation).
[75] See Ex. N, p. 3 (T.52:2-10).
[76] See Ex. N, p. 11 (T.132:4-20); Ex. P, p. 8 (T.51:3-5); Ex. FF, pp. 3-4.

recommended a treatment option other than ablation.  However, as discussed above, these claims are baseless and Plaintiff has not submitted (nor can he now submit) expert evidence to support any such claims against Dr. Kemeny.

**D)  Dr. Sofocleous' decision to proceed with ablation was within the standard of care.**

As Dr. Sofocleous explained, and Plaintiff's expert Dr. Navuluri did not refute, a lesion within 5 mm of the hilum is considered an unsafe location for ablation.[77]  Plaintiff's expert surgeon, Dr. DeMatteo, defined the hilum as the center of the liver where the common bile duct, the main portal vein, and the hepatic artery all enter the liver at the exact same spot and are touching.[78]  Both of Ms. Zak's lesions seen in March 2017 were more than 10 mm (1.0 cm) from the hilum; therefore, these lesions were in locations amenable to percutaneous ablation.[79]

Viewing the evidence in a light most favorable to Plaintiff, the lesion at issue was in closest proximity – less than 4 mm away according to Plaintiff's expert, Dr. DeMatteo – to the left portal vein near the left bile duct.[80]  Tumors within a few millimeters of a vessel, such as the left portal vein, are known as perivascular tumors and are commonly ablated by interventional oncologists as opposed to surgeons, which is an advantage to percutaneous microwave ablation.[81]  Dr. Sofocleous reasonably believed he could completely and safely treat this lesion without damaging the portal vein because it was anticipated that the blood flowing in the left portal vein would dissipate the ablation heat, which is known as the heat sink effect.[82]  As Defendants' expert, Dr. Goldberg, explained, the portal vein is known to cool and limit the amount of ablation, such that the portal vein is not considered a critical structure traditionally

---

[77] See Ex. Q, pp. 3-4 (T.42:7-43:6).
[78] See Ex. O, pp. 3-5 (T.83:14-85:3).
[79] See Ex. Z, p. 3 (T.35:3-11); Ex. Q, pp. 4-5 (T.43:16-44:12).
[80] See Ex. O, p. 9 (T.107:2-6).
[81] See Ex. T, pp. 3-4; Ex. W, p. 3.
[82] See Ex. Q, p. 9 (T.110:21-24); Ex. X, p. 4 (T.142:7-22).

damaged by ablation.[83]  Dr. Sofocleous also had access to a PET/CT scan when he performed the ablation, which Plaintiff's expert, Dr. Navuluri, opined placed Dr. Sofocleous at an advantage for remarkably precise targeting of the lesions during the ablation.[84]  Accordingly, Plaintiff's expert, Dr. Navuluri, opined that Dr. Sofocleous' decision to proceed with the ablation with the use of the PET-CT scan conformed with the standard of care.[85]

**E)  Dr. Sofocleous performed the ablation in accordance with the standards of care.**

New York law requires that Plaintiff's expert identify and indicate a departure from the standard of care in order to succeed on a claim of medical malpractice concerning Dr. Sofocleous' care and treatment while performing the ablation.  Plaintiff's expert, Dr. Navuluri, opined that the standard of care when performing an ablation is to achieve a minimum 1 cm margin around each tumor in order to effectively and fully eradicate each tumor.[86]  Dr. Navuluri did not set forth any other requirements in terms of the standard of care and did not testify or opine that Dr. Sofocleous departed from the standard of care when he performed the ablation.

On April 10, 2017, Dr. Sofocleous performed PET/CT-guided two overlapping ablations of the two liver metastases using two probes for each lesion in order to obtain good coverage and limit the chance of spreading the tumor.[87]  Dr. Sofocleous' summary of the procedure indicated that he ablated each lesion for 20 minutes and utilized energy that ranged from 40 to 60 Watts. Defendants' interventional radiology expert, Dr. Fischman, opined that Dr. Sofocleous' use of two probes to ablate each lesion is a "bracket" technique most interventional radiologists use to minimize the risk of disseminating disease.[88]  Plaintiff's expert, Dr. Navuluri, admitted that the

---

[83] See Ex. Z, p. 6 (T.71:3-8).
[84] See Ex. R, pp. 2-3; Ex. S, p. 6 (T.73:10-19).
[85] See Ex. R, p. 2 (16); Ex. S, p. 7 (T.86:12-17); see also Ex. Z, p. 2 (T.10:18-25).
[86] See Ex. R, p. 5.
[87] See Ex. Q, p. 16 (T.179:2-7 and T.179:10-13)
[88] See Ex. W, p. 3.

use of one probe risked incomplete treatment.[89]   In addition, Dr. Navuluri opined that the two overlaps of each tumor was a technique used by interventional oncologists to ensure no cancer cells are left behind.[90]  Defendants' interventional oncology expert, Dr. Goldberg, explained that in determining the appropriate amount of time and energy to apply during an ablation, one uses his experience and the collective experience in the medical literature.[91]   Defendants' experts, Drs. Fischman and Goldberg, opined that Dr. Sofocleous' total time and wattage used during the ablation were in accordance with proper clinical standards of care.[92]

The evidence demonstrates that the ablation was complicated by the unexpected, unforeseeable and remote risk of a left portal vein thrombosis that allowed the heat to go further than anticipated with injury to the bile duct and a larger than anticipated ablation zone.[93] Defendants' expert, Dr. Fischman, opined that the left portal vein thrombosis and larger than anticipated ablation zone were the result of factors outside of Dr. Sofocleous' control and not an indicator of any departure from the standard of care.[94]  As Defendants' expert, Dr. Goldberg, explained, the left portal vein thrombosis stopped the heat sink effect, and in turn, there was no perfusion to cool the tissue and unintended tissue was ablated.[95]   Therefore, the ablation complications were unrelated to Dr. Sofocleous' ablation techniques or the number of probes and amount of energy applied.[96]

Accordingly, there is no expert evidence before the Court that Defendants departed from the standard of care in the care and treatment of Ms. Zak in March/April 2017.  Accordingly, Defendants are entitled to summary judgment on the cause of action for medical malpractice.

---

[89] See Ex. S, p. 13 (T.157:5-9).
[90] See Ex. S, p. 14 (T.162:9-13).
[91] See Ex. Z, p. 8 (T.97:8-12).
[92] See Ex. W, p. 3; Ex. Y, p. 1; see also Ex. T, p. 5.
[93] See Ex. Q, p. 19 (T.216:8-22); Ex. W, p. 3.
[94] See Ex. X, pp. 6-8 and 10 (T.175:24-25, T.177:3-178:3 and T.184:11-18).
[95] See Ex. Z, p. 1 (T.41:8-16).
[96] See Ex. X, pp. 6-7 (T.175:24-25, T.177:3-178:3).

See Walton v. Lee, No. 15 Civ. 3080 (PGG), 2019 WL 1437912, *9 (S.D.N.Y. Mar. 29, 2019)

(granting summary judgment where plaintiff did not offer evidence that the physicians deviated

from accepted medical practice); Kavazanjian v. Rice, No. 03 Civ. 1923, 2008 WL 5340988, at

*9 (E.D.N.Y. Dec. 22, 2008) (granting summary judgment on medical malpractice claim since

plaintiff "adduced no evidence – expert or otherwise – as to the applicable standard of care that

[the defendant] supposedly breached").

## POINT II

### THERE IS NO CAUSAL NEXUS BETWEEN THE ABLATION AND MS. ZAK'S ALLEGED LIVER DAMAGE LEADING TO LIVER FAILURE AND HER DEATH

Plaintiff claims that the ablation caused Ms. Zak to suffer catastrophic and irreparable

damage resulting in liver failure and her death during a liver transplant surgery 2.5 years after the

ablation.  However, there is no credible expert opinion to support this claim.  The Defendants

acknowledge that the ablation caused a severe bile duct injury and subsequent biloma formation

requiring stenting.  In addition, the Defendants acknowledge that there was concern immediately

after the ablation about acute liver dysfunction.  However, as Defendants' hepatology expert, Dr.

Bernstein, opined, Ms. Zak's liver function improved within weeks of the ablation to a return to

her pre-ablation abnormal baseline levels by April 24, 2017, such that Ms. Zak did not go into

acute liver failure in April 2017.[97]  Dr. Bernstein also opined that since Ms. Zak was able to

receive Pembro, which risks hepatotoxicity, in October 2017, her liver did not have significant

dysfunction at that time.[98]

Significantly, Ms. Zak's subsequent treating physician, Dr. Mayo, directly repudiated

Plaintiff's claim that Ms. Zak's central liver, her biliary system, her portal vein system, and her

---

[97] See Ex. EE, pp. 12-13 (T.117:4-5 and T.123:17-24).
[98] See Ex. EE, pp. 15-16 (T.139:22-140:5).

hepatic arterial system were irreparably damaged because of the ablation.[99]  Indeed, the evidence demonstrates that after the left portal vein thrombosis occurred during the ablation, the liver was able to reperfuse with returned flow to that area through the formation of collateral vessels.   As soon as one day after the ablation, on April 11, 2017, collateral vessels were forming.   By June 26, 2017, the left portal vein thrombosis was stable with multiple collaterals noted.   On July 4, 2017, intrahepatic portal collaterals were visualized, which Plaintiff's expert, Dr. Navuluri, opined demonstrated that Ms. Zak's body had worked to reperfuse the area where the left portal vein had occluded during the ablation.[100]

There is also no evidence that the hepatic artery was damaged by the ablation.  Although there was concern of hepatic artery bleeding on April 13, 2017, no active bleeding was found during the arteriogram and no embolization was needed.[101]  Months later, on July 4, 2017, Ms. Zak underwent embolization of the hepatic artery.  The site of extravasation was the proper hepatic artery just distal to the HAI pump, not the ablation site.  As Dr. Kemeny explained, HAI pump patients commonly require embolization of the hepatic artery because the catheter sits in the artery and weakens it over time.[102]  Accordingly, Defendants' expert, Dr. Bernstein, opined that Ms. Zak's hepatic artery embolization was unrelated to the ablation and that the most likely cause was the HAI pump catheter sitting in Ms. Zak's artery for over 2.5 years.[103]

In addition, the evidence demonstrates that prior to the ablation, Ms. Zak was starting to suffer the cumulative toxic effects of HAI FUDR treatment with biliary injury as her ALK (an enzyme that indicates bile duct injury) levels were worsening in November 2016, requiring cessation of FUDR therapy and necessitating placing heparin/dexamethasone in the HAI pump in

---

[99] See Ex. M, p. 5 (T.42:15-22).
[100] See Ex. S, p. 15 (T.166:8-20).
[101] See Ex. F, pp. 11-12.
[102] See Ex. P, p. 10 (T.101:13-20).
[103] See Ex. EE, pp. 14 and 17 (T.135:10-18 and T.160:5-8).

an effort to minimize biliary sclerosis.[104]   Defendants' body imaging expert, Dr. Sadler, also opined that prior to the ablation, by January 24, 2017, there had been a significant diminution in the caliber of Ms. Zak's main hepatic arterial structures when compared to July 2014, which was consistent with a chronic process such as FUDR pump effect.[105]   The arteriogram performed on April 13, 2017 was consistent with Dr. Sadler's opinion as multifocal arterial stenosis (narrowing) was deemed likely from prior locoregional therapy and unrelated to the ablation.[106]

Defendants' expert, Dr. Bernstein, opined that months after the ablation, Ms. Zak developed progressive liver disease due to multiple factors, including her prior surgeries that decreased the overall volume of her liver, the FUDR HAI pump therapy, and different chemotherapies.[107]   This opinion is bolstered by Ms. Zak's subsequent treating physician, Dr. Mayo, who similarly opined that Ms. Zak's ultimate outcome of liver failure was multifactorial given her history of diffuse liver metastases, extensive treatment with HAI pump therapy, lots of chemotherapy, and prior liver operations.[108]   Ms. Zak's other subsequent treating physician, Dr. Lopez, testified that he deferred to Cleveland Clinic as to the cause of Ms. Zak's liver failure.[109] In June 2018, Dr. Robert J. Pelley at Cleveland Clinic opined that Ms. Zak's "liver dysfunction was all secondary to complications of her chemotherapy and surgeries as well as her tumor."

On August 23, 2019, 2.5 years after the ablation, Ms. Zak died during a liver transplant surgery due to cardiopulmonary failure.  At the time of her death, Cleveland Clinic performed a pathologic exam of Ms. Zak's explanted liver, which demonstrated that Ms. Zak's end stage liver disease was likely associated with chemotherapy induced liver injury and superimposed

---

[104] See Ex. E, pp. 16 and 18; Ex. BB, pp. 1-2 (T.135:6-136:11); Ex. FF, p.1.
[105] See Ex. CC.
[106] See Ex. F, p. 13; Ex. EE, pp. 10-11 (T.109:24-110:8).
[107] See Ex. EE, p. 1 (T.22:2-19).
[108] See Ex. M, pp. 6-8 (T.43:11-45:2).
[109] See Ex. N, pp. 12-13 (T.146:3-147:13).

complications of cirrhosis.  There is no opinion by the Cleveland Clinic pathologist that the ablation caused Ms. Zak's liver failure (cirrhosis).  Indeed, Defendants' liver pathology expert, Dr. Theise, opined that the diffuse pathological changes seen in Ms. Zak's explanted liver were consistent with an accumulation of chronic toxic effects from FUDR HAI pump treatment (chemotherapy to the liver), not damage from the ablation, because small bile ducts had been eliminated throughout her liver.[110]  The opinions of the Cleveland Clinic pathologist and the Defendant's pathology expert, Dr. Theise, concerning the cause of Ms. Zak's liver failure are not contradicted by any of Plaintiff's experts.  Accordingly, there is no credible evidence or expert opinion that the ablation caused Ms. Zak's liver failure and death warranting summary judgment on this cause of action.

### POINT III

### PLAINTIFF CANNOT CLAIM LACK OF INFORMED CONSENT AGAINST MEMORIAL

"The necessity of obtaining informed consent is governed by statute, N.Y. Public Health Law §2805-d, which is addressed to doctors" and "beyond the hospital's province."  Hoemke v. New York Blood Center, No. 88 Civ. 9029 (RO), 1898 WL 147642, *6 (S.D.N.Y. Nov. 28, 1989).  In fact, N.Y. Public Health Law §2805-d explicitly applies to "the person providing the professional treatment…".  In this case, if Plaintiff can prove his claim, only the physician who performed the ablation, Dr. Sofocleous, may be liable for failure to obtain informed consent.  Accordingly, Plaintiff's lack of informed consent cause of action as asserted against Memorial must be dismissed.

---

[110] See Ex. AA, pp. 1-2; Ex. BB, pp. 3-5 (T.206:5-208:15).

## POINT IV

## DR. SOFOCLEOUS PROPERLY OBTAINED INFORMED CONSENT FROM MS. ZAK

The evidence demonstrates that on March 22, 2017, Dr. Sofocleous obtained Ms. Zak's consent for the ablation in a manner that conformed with a reasonable interventional radiologist under similar circumstances and permitted Ms. Zak to make a knowledgeable evaluation prior to consenting to the ablation.  Defendants' expert, Dr. Fischman, explained that it is not feasible for a provider to describe every potential risk; therefore, the standard of care is to describe the most common potential risks.[111]  The evidence demonstrates that on March 22, 2017, Dr. Sofocleous informed Ms. Zak of the common risks of ablation (bleeding and infection), and the specific risk of injury to the bile duct given the lesion at issue being near the left bile duct.  The consent form Ms. Zak signed on March 22, 2017 also listed the risk of injury to the liver, which Plaintiff's expert, Dr. Navuluri, opined met the standard of care.[112]

Dr. Sofocleous testified that he did not inform Ms. Zak of any other risks to ablation, including portal vein thrombosis, because he considered those risks to be remote.[113]  If Dr. Sofocleous had informed Ms. Zak of the rare risk of portal vein thrombosis, he would have told her he did not believe the portal vein would be injured.[114]  Plaintiff's expert, Dr. Navuluri, opined that if a provider considers a risk to be remote, the standard of care does not require that it be warned of specifically.[115]  Dr. Navuluri testified that the risk of portal vein thrombosis was a rare risk of ablation.[116]  Accordingly, a reasonable interventional radiologist in Dr. Sofocleous'

---

[111] See Ex. X, p. 2 (T.79:9-21).
[112] See Ex. R, p. 1.
[113] See Ex. Q, p. 10 (T.113:12-23).
[114] See Ex. Q, p. 13 (T.134:6-15).
[115] See Ex. S, p. 5 (T.60:19-24).
[116] See Ex. S, pp. 3-4 (T.58:2-59:2).

position would not have informed Ms. Zak of the rare and unexpected risk of portal vein thrombosis.

Dr. Sofocleous testified that he did not discuss any alternatives with Ms. Zak because there was no alternative to ablation that was standard of care or that gave Ms. Zak the best chance of complete tumor eradication.[117]   Significantly, Dr. Navuluri opined that if a physician does not feel an alternative is a reasonable or appropriate one, the standard of care does not require disclosure of that alternative.[118]   Dr. Navuluri further opined that the March 22, 2017 visit could have been scheduled to discuss any questions related to the ablation.[119]   Had there been a discussion of alternatives, Ms. Zak would have been told the other options were inferior and that she would get the best results with ablation because no other option offered complete tumor eradication.[120]   Accordingly, Dr. Sofocleous' consent discussions conformed with the standards of care because no reasonable interventional radiologist would have informed Ms. Zak of alternatives to ablation that were inferior and not reasonable.[121]

Finally, the evidence demonstrates that when consenting to the ablation, Ms. Zak was aware of the benefits of the ablation because she was glad that ablation was not surgery, she was tired of and failing chemotherapy, and she knew ablation improved her chances of extending her life.  In addition, Ms. Zak had undergone a successful ablation with Dr. Sofocleous eight months earlier, and three times previously discussed with Dr. Sofocleous the risk of injury to the bile duct.  Accordingly, the evidence demonstrates that a reasonable patient in Ms. Zak's position, who had on many occasions expressed a specific preference for curative therapy over inferior treatment, even if informed of inferior alternatives that were not the standard of care and that a

---

[117] See Ex. Q, pp. 1-2 (T.32:14-23 and 35:8-17).
[118] See Ex. S, p. 1 (T.45:5-13).
[119] See Ex. R, p. 4.
[120] See Ex. Q, p. 1 (T.32:17-20).
[121] See Ex. Z, p. 7 (T.40:13-24); Ex. W, pp. 1-2.

rare and remote risk of ablation was portal vein thrombosis, Ms. Zak would not have declined to undergo the ablation because it offered her the best option for cure.

## POINT V

### THERE IS NO EVIDENCE TO SUPPORT A CLAIM OF NEGLIGENT HIRING OR NEGLIGENT SUPERVISION

Plaintiff's Complaint insinuates a cause of action sounding in negligent hiring and supervision.[122]  However, there is no allegation that Dr. Sofocleous, an employee of Memorial, acted outside the scope of his employment when he performed the ablation.  Accordingly, any such claims must fail.  See Sugarman v. Equinox Holding Inc., 73 A.D.3d 654, 655, 901 N.Y.S.2d 615, 616 (1st Dept. 2010).

## POINT VI

### THERE IS NO EVIDENCE TO SUPPORT A CLAIM OF SPOLIATION

There is no evidence that Dr. Sofocleous or anyone from Memorial had a "culpable state of mind" and destroyed or altered evidence relevant to this case.  Therefore, Plaintiff's allegations of potential spoliation asserted as a possible claim during discovery must fail.  See West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).

## POINT VII

### PLAINTIFF CANNOT RECOVER CERTAIN DAMAGES SOUGHT

**A) Plaintiff seeks damages that are not recoverable under New York Law.**

Plaintiff's Complaint seeks the following unrecoverable categories of damages: (1) "damages for grief, loss of companionship, impairment of the quality of life, inconvenience, pain and suffering, and emotional distress incurred by" Plaintiff and his daughter; (2) loss of consortium for Plaintiff as part of the wrongful death claim; and (3) "pre-judgment interest from

---

[122] See Ex. A, ¶4 (Memorial supervised the ablation procedure) and ¶25 (Memorial represented that its employees were competent to perform medical care).

the date of the [ablation] through judgment."[123] <u>See</u> <u>Dershowitz v. U.S.</u>, No. 12-CV-08634 (SN),

2015 WL 1573321, *30 (S.D.N.Y. Apr. 8, 2015) ("[P]ecuniary loss excludes grief, lost society,

lost companionship, and lost affections."); <u>De Angelis v. Lutheran Med. Ctr.</u>, 84 A.D.2d 17, 26

(2d Dept. 1981), <u>aff'd</u> 58 N.Y.2d 1053, 55 (1983) (New York does not recognize a child's loss of

parental consortium); CPLR §5002 (interest runs from the date of verdict).

**B) Plaintiff cannot satisfy his burden of proof for past and future lost earnings.**

Plaintiff cannot prove these damages by a preponderance of the evidence.  Indeed, the

evidence demonstrates that Ms. Zak left the work force in 2014, nearly 3.5 years prior to the

ablation and over 5.5 years prior to her death, because she was on medical disability for her

Stage IV cancer.[124]  Plaintiff's expert, economist Dr. Smith, calculated claimed lost earnings

based on an assumption that Ms. Zak had a normal life expectancy; however, the medical

evidence and testimony establish she had a terminal illness.[125]  Dr. Smith also calculated claimed

lost earnings on the assumption that, but for the ablation, Ms. Zak would have returned to work

full-time on January 1, 2018 as a healthy individual with a full work-life expectancy of 43.2

years until the age of 80.[126]  This claim requires assumptions that Ms. Zak was cured of Stage IV

cancer in January 2018, that she did not develop liver failure as a result of her prior extensive

cancer treatment, and that she wanted to return to work, all of which is pure speculation and not

inferable from the evidence.[127]

**C) Plaintiff cannot satisfy his burden of proof for loss of household services.**

In calculating claimed past and future loss of household services, Dr. Smith was shown

no documentation as the law requires of expenditures of household services from April 2017

---

[123] <u>See</u> Ex. A, ¶42(f), (g) and (h).
[124] <u>See</u> Ex. H, p. 3 (T.37:11-25).
[125] <u>Compare</u> Ex. V, p. 11 (T.82:7-15) <u>with</u> Ex. N, p. 8 (T.113:3-6 and T.113:12-17).
[126] <u>See</u> Ex. V, p. 5 (T.63:8-24).
[127] <u>See</u> Ex. N, pp. 1-2 (T.33:9-11 and T.34:15-18); Ex. M, pp. 7 and 12 (T.44:13-19 and T.114:11-20).

until Ms. Zak passed away, which Dr. Smith considered irrelevant to his calculations.[128]  Instead, Dr. Smith relied on a claimed interview statement with Plaintiff that Ms. Zak had handled most of the household services as needed (e.g., cleaning, laundry, cooking and gardening).[129] However, the evidence demonstrates that for the three years prior to the ablation, Ms. Zak was undergoing and suffering from the effects of extensive cancer treatment with chemotherapy and two surgeries, was frequently traveling across the country for her care, and had significant anxiety and depression.  In addition, the evidence demonstrates that Ms. Zak's husband was not working during this time and therefore helped care for Ms. Zak and their daughter.  Accordingly, Plaintiff cannot recover for loss of Ms. Zak's alleged household services because such an award would be impermissibly speculative and not supported by the evidence.  See Finney v. Morton, 170 A.D.3d 811, 814, 95 N.Y.S.3d 566 (2d Dept. 2019) (holding evidence failed to support an award of damages for past and future loss of household services, which damages were speculative and not warranted by the facts).

**D) Plaintiff cannot satisfy his burden of proof for recovery of funeral expenses.**

Plaintiff has not produced any proof of having incurred Ms. Zak's funeral or burial expenses, and as such, cannot recover for this expense.

## CONCLUSION

For all of the foregoing reasons, the Defendants' motion for summary judgment should be granted and the Complaint dismissed with prejudice in its entirety.  To the extent any of Plaintiff's claims survive summary judgment, Plaintiff cannot establish his burden of proof for various categories of damages.

---

[128] See Ex. V, pp. 9-10 (T.80:25-81:17).
[129] See Ex. V, p. 9 (T.80:12-24).

Dated:  New York, New York
        August 16, 2021

                                    KAUFMAN BORGEEST & RYAN LLP

                                    _____
                                    Betsy D. Baydala
                                    Andrew S. Kaufman
                                    *Attorneys for Defendants*
                                    120 Broadway, 14th Floor
                                    New York, NY 10271
                                    Telephone: (212) 980-9600
                                    Fax: (212) 980-9291
                                    bbaydala@kbrlaw.com
                                    akaufman@kbrlaw.com


TO:     Via ECF

        Scott Hendler, Esq.
        Laura Goettsche, Esq.
        Matt Dodd, Esq.
        *Attorneys for Plaintiff*

        Hendler Flores Law, PLLC
        1301 West 25th Street, Suite 400
        Austin, Texas 78705
        shendler@hendlerlaw.com
        lgoettsche@hendlerlaw.com

        Dodd Law Firm, P.C.
        3825 Valley Commons Dr., Suite 2
        Bozeman, MT 59718
        matt@doddlawfirmpc.com