# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Scott Powers, individually, as Representative of the Estate of Erika Zak, and as the natural guardian of L.P., a minor,<br><br>     Plaintiff,<br><br> vs.<br>Constantinos Sofocleous, and Memorial Sloan Kettering Cancer Center,<br><br>     Defendants. | Case No.:<br>1:20-cv-02625 (LGS) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Scott M. Hendler
Laura Alexandra Goettsche
Matt Dodd
**Attorneys for Plaintiff**

**Hendler Flores Law, PLLC**
901 S. MoPac Expressway
Bldg 1, Ste 300
Austin, TX 78746
Tel: 512-439-3202
Fax: 512-439-3201
shendler@hendlerlaw.com
lgoettsche@hendlerlaw.com

**Dodd Law Firm, P.C.**
3825 Valley Commons Dr., Suite 2
Bozeman, MT 59718
matt@doddlawfirmpc.com

**Table of Contents**

I.   STATEMENT OF FACTS ................................................................................................. 1

II.   LEGAL STANDARD .................................................................................................... 4

   A.   Medical Malpractice ............................................................................................. 5

   B.   Lack of Informed Consent ................................................................................... 6

   C.   Wrongful Death .................................................................................................... 7

II.   ARGUMENT ............................................................................................................... 8

   A.   Medical Malpractice ............................................................................................. 8

      1.   Dr. Sofocleous violated the standard of care by proceeding with the ablation. ........................... 8

      2.   Dr. Sofocleous failed to adhere to the standard of care in his performance of the ablation. ........ 9

      3.   MSK should have required that Erika's case be presented to a multidisciplinary tumor board. 14

      4.   MSK's Dr. Kemeny failed to consider other viable alternative treatments to chemotherapy or ablation such as immunotherapy .................................................................................. 15

   B.   Medical Malpractice and Wrongful Death—Causation ......................................... 16

      1.   Erika's liver failure and subsequent death were a direct result of the damage Dr. Sofocleous caused to Erika's liver during the ablation procedure ......................................................... 16

   C.   Lack of informed consent ................................................................................... 22

      1.   Dr. Sofocleous failed to inform Erika of reasonably foreseeable risks which a reasonable physician would have discussed ......................................................................................... 22

      2.   Dr. Sofocleous failed to present the alternatives that reasonable physicians would have disclosed ......................................................................................................................... 24

      3.   A reasonable person would not have undergone the procedure if adequately informed of the risks and alternatives, and Erika would have behaved as a reasonable person. .................. 26

      4.   MSK can be held liable for its employees' failure to obtain informed consent. ....................... 27

   D.   Damages ............................................................................................................. 27

      1.   Plaintiff is entitled to the damages he has plead. ......................................................... 27

      2.   Plaintiff's damages are recoverable under New York law ............................................. 29

      3.   There is a genuine issue as to loss of household services. ............................................. 30

      4.   There is a genuine issue of material fact as to recovery of funeral expenses. ................... 30

**Table of Authorities**

Cases

*Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*, No. 19cv9270 (DLC), 2021 WL 2896040, 2021 U.S. Dist. LEXIS 128773 at \*13–15 (S.D.N.Y. July 9, 2021)...................................................5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). .................................................................4

*Bailey v. Owens*, 17 A.D.3d 222, 223 (N.Y. App. Div. 2005).............................................................26

*Bing v. Thunig*, 2 NY2d 656, 666–67 (N.Y. 1957) ................................................................................5

*Chong v. New York City Transit Authority*, 441 N.Y.S.2d 24, 25–26 (N.Y. App. Div. 1981). ................7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). ...4

*DiGeronimo v. Fuchs*, 927 N.Y.S.2d 904, 907 (N.Y. Sup. Ct. 2011).....................................................5

*Erie R. Co. v. Tompkins*, 304 U.S. 64, 80 (1938); *see also Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003)..............................................................................................................4

*Figueroa-Burgos .v Bieniewicz*, 23 N.Y.S.3d 369, 371 (N.Y. App. Div. 2016)......................................6

*Gaspard v. Aronoff*, 61 N.Y.S.3d 240, 243 (N.Y. App. Div. 2017). .............................................5, 15

*Gonzalez v. New York City Hous. Auth.*, 77 N.Y.2d 663, 668 (N.Y. 1991)............................................7

*Gotlin v. Lederman*, 367 F. Supp. 2d 349, 361 (E.D.N.Y. 2005) .......................................................26

*Gross v. Friedman*, 73 NY2d 721, 722–23 (N.Y. 1988) ........................................................................5

*Grunwald v. Bon Secours Charity Health Sys. Med. Grp*, P.C., No. 18-cv-3208 (NSR), 2020 U.S. Dist. LEXIS 80222 at \*10, 2020 WL 2192683 (S.D.N.Y. May 6, 2020)......................................................27

*Haspil v. Church of St. Cyril*, 491 N.Y.S.2d 914, 917 (N.Y. Sup. Ct. 1985)........................................27

*Hill v. St. Clare's Hosp.*, 67 N.Y.2d 72, 79 (N.Y. 1986) ....................................................................26

*Hoemke v. New York Blood Center, et al.*, No. 88 CIV. 929(RO), 1989 WL 147642 at \*6 (S.D.N.Y. Nov. 28, 2989). .......................................................................................................................................26

*I.M. v. United States*, 362 F. Supp. 3d 161, 194 (S.D.N.Y. 2019)......................................................28

*In re Estate of Feld*, 582 N.Y.S.2d 922, 923–24 (Sur Ct, New York County 1992) (citing *Tilley v. Hudson Riv. R. R. Co.*, 24 N.Y. 471, 475–76 (N.Y. 1862)....................................................................7, 8, 27

*In re World Trade Center Disaster Site Litigation*, 722 F.3d 483, 487–88 (2d Cir. 2013) ....................5

*Millington v. Se. Elevator Co.*, 22 N.Y.2d 498, 502 (N.Y. 1968).......................................................27

*Nestorowich v. Ricotta*, 97 N.Y.2d 393, 398 (N.Y. 2002). ...............................................5, 6, 13, 14

*Parilis v. Feinstein*, 49 N.Y.2d 984, 985 (N.Y. 1980)..........................................................................7

*Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013)........................................................................4

*Quintero v. Rite Aid of N.Y., Inc.*, 09 Civ. 6084 (JLC), 2011 WL 5529818, 2011 U.S. Dist. LEXIS 130920 (S.D.N.Y. Nov. 10, 2011) ...............................................................................................................5

*Salandy v. Bryk*, 55 A.D.3d 147, 154 (N.Y. App. Div. 2008) ...........................................................26

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). ...........4

*Sita v. Long Island Jewish-Hillside Med. Ctr.*, 22 A.D.3d 743, 743 (N.Y. App. Div.). ...........................26

*Spadaccini v. Dolan*, 407 N.Y.S.2d 840, 843–44 (N.Y. App. Div. 1978).................................5, 6, 13, 14

*Spano v. Bertocci*, 749 N.Y.S.2d 275 (N.Y. App. Div. 2002) .............................................................6

*Stukas v. Streiter*, 918 N.Y.S.2d 176, 180 (N.Y. App. Div 2011) .......................................................5

*Toledo v. Iglesia Ni Christo*, 18 N.Y.3d 363, 367–68 (N.Y. 2012) ..............................................27, 28

*Torres v. Hyun Taik Cho*, 902 N.Y.S.2d 781, 783–84 (N.Y. Sup. Ct. 2010).......................................27

*Trabal v. Queens Surgi-Center*, 779 N.Y,S.2d 504, 507 (N.Y. App. Div. 2004) ...................................7

*Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010).............................................................4

*Yong Qin Luo v. Mikel*, 625 F.3d 772, 777 (2d Cir. 2010). ........................................................... 5

*Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) ............................................ 4

## Statutes

N.Y. Est. Powers & Trusts Law § 5-4.3 ............................................................................... 27

N.Y. Public Health Law § 2805-d [1]. ................................................................................. 6

## Other Authorities

Fed. R. Civ. P. 36(e) ............................................................................................... 4

## I.   STATEMENT OF FACTS[1]

On April 10, 2017, Dr. Sofocleous proceeded with his decision to perform a microwave ablation to remove two tiny lesions on Erika Zak's liver. The result was catastrophic, leaving a "giant hole"[2] burned in Erika's liver and irreparably damaging the three vital structures in the hilum—the hepatic artery, the portal vein, and the common biliary duct—necessary for the liver to function properly.[3] Dr. Manan Shah, Plaintiff's gastroenterologist and hepatologist expert, summarized the damage:

> . . . there was significant and irreversible injury to the liver as a result of the ablation. Her procedure was complicated by new portal vein thrombosis as seen on an ultrasound on April 12, 2017. She had a significant and larger-than-anticipated parenchymal liver injury on post-procedural CT scan with a 9 x 13 cm area of hypoperfusion post-RFA. She suffered a bile leak and infected biloma requiring drain placement. An arteriogram on April 13, 2017, showed multifocal hepatic artery strictures that were not seen on prior imaging.[4]

The destruction the ablation caused to Erika's liver sent her liver function into a downward spiral towards complete liver failure; she had one option for survival—a liver transplant.[5]

Erika Zak was undergoing treatment for colorectal cancer at Memorial Sloan Kettering Cancer Center ("MSK"). On March 22, 2017, three years into her treatment, as her cancer was in retreat, Erika met with her medical oncologist Dr. Nancy Kemeny.[6] Dr. Kemeny informed Erika that her scans detected two tiny lesions on her liver.[7] Each lesion was about 1 cm x 1.3 cm in diameter.[8] Dr. Kemeny stated that she wanted to "ask Dr. [Sofocleous], you know, about ablating those."[9] So Erika, along with Chloe Metz, her companion that day, went to consult with Dr. Sofocleous.[10]

---

[1] All exhibits referenced herein and cited as "Ex." are annexed to the Declaration of Scott M. Hendler.
[2] **Ex. 1**, Deposition of Scott Powers (Tr. 181:23–182:3).
[3] **Ex. 2**, Report of Dr. Ronald DeMatteo (p. 12).
[4] **Ex. 33**, Report of Dr. Manan Shah (p. 1).
[5] **Ex. 3**, ZAK_NY 001002–03.
[6] *See* **Ex. 32**, March 22, 2017, Dr. Kemeny Consult Transcript.
[7] **Ex. 32**, March 22, 2017, Dr. Nancy Kemeny Transcript (Tr. 2:16–22).
[8] **Ex. 34**, Report of Dr. Rakesh Navuluri (p. 2).
[9] **Ex. 32**, March 22, 2017, Dr. Nancy Kemeny Transcript (Tr. 2:16–22).
[10] **Ex. 4**, Deposition of Chloe Metz (Tr. 51:5–10).

Chloe accompanied Erika that day because Erika's husband, Scott Powers, who was Erika's principal healthcare advocate, remained in Oregon with their 3-year-old daughter.[11] Chloe recorded the consultations with Erika's doctors on her phone so Scott could hear for himself what they advised.[12] The consultation with Sofocleous lasted for all of thirteen minutes.[13]

Despite conceding under oath his responsibility to obtain informed consent from Erika for the ablation, Dr. Sofocleous failed to discuss a single alternative to the microwave ablation [14] or discuss any of the reasonably foreseeable risks involved with the procedure.[15] He failed to explain to Erika that one of the lesions was in a dangerous location for ablation given how precariously close it was to the liver's porta hepatis, also called the hepatic hilum. This is the point where the critical structures vital to the liver's ability to function enter the organ.[16] Dr. Sofocleous did not tell Erika about the risk of damage to these vital structures ablation posed or that damage to these vital structures would lead to liver failure.[17] And he never explained that such damage would prevent her from ever living a normal life again.[18]  Without discussing alternatives or disclosing these material risks, Dr. Sofocleous scheduled the ablation for April 10, 2017, suggesting that it was a routine procedure and that Erika she would be "partying" two weeks later.[19]

 Compounding this breathtaking lack of informed consent, Dr. Sofocleous's notations in the medical record regarding informed consent contain several statements contradicted by the recording of the conversation. Dr. Sofocleous wrote in Erika's medical chart that he discussed alternatives and risks with Erika when in fact he never discussed any alternatives or risks.[20] Moreover, neither Dr. Sofocleous nor Dr. Nancy Kemeny ever presented their proposed approach

---

[11] **Ex. 4**, Deposition of Chloe Metz (Tr. 48:20–49:8); **Ex. 1**, Deposition of Scott Powers (Tr. 29:16–21).
[12] **Ex. 4**, Deposition of Chloe Metz (Tr. 22:4–22).
[13] **Ex. 4**, Deposition of Chloe Metz (Tr. 76:4–11).
[14] **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 47:17–49:2, 256:4–7); *see also* **Ex. 19**, March 22, 2017, Sofocleous Transcript.
[15] *See* **Ex. 19**, March 22, 2017, Dr. Constantinos Sofocleous Transcript.
[16] *Compare* **Ex. 19**, March 22, 2017, Dr. Constantinos Sofocleous Transcript; *with* **Ex. 2**, Report of Dr. Ronald DeMatteo (p. 11).
[17] *See* **Ex. 19**, March 22, 2017, Dr. Constantinos Sofocleous Transcript.
[18] *See* **Ex. 19**, March 22, 2017, Dr. Constantinos Sofocleous Transcript.
[19] **Ex. 19**, March 22, 2017, Dr. Constantinos Sofocleous Transcript (Tr. 4:7–22, 13:20–14:23).
[20] *Compare* **Ex. 19**, March 22, 2017, Dr. Constantinos Sofocleous Transcript; *with* **Ex. 3**, ZAK_NY 012331.

of ablation to a multi-disciplinary tumor board. Had they done so, Dr. Ronald DeMatteo, Erika's treating surgeon at MSK and the Vice Chair of its surgery department, would have learned of the intended procedure and "the procedure wouldn't have happened."[21]

Dr. Sofocleous deviated from the standard of care under New York law by failing to exercise his best judgment in deciding to proceed with the ablation in the first place; he then doubled down on that failure by negligently performing the ablation using more ablation probes than recommended, at higher temperatures than recommended, for longer ablation times than recommended,[22] destroying more than twice the area of liver tissue he targeted.

Dr. DeMatteo described the result as "catastrophic" damage, and "the worst complication I've ever seen from any ablation or heard about ever...on a scale unlike no other."[23] Defendants' own expert Dr. Goldberg conceded that, "A much larger area of tissue destruction was created than would have been expected in the normal case," calling it "the largest that I've seen over thousands of ablations, both experimentally and clinically."[24] Plaintiff's expert diagnostic radiologist Dr. Coakley, Chief of Radiology at Oregon Health and Science University, described it this way: "Immediately after the ablation procedure, a large 'death zone' of non-enhancing necrotic tissue is evident in the central liver, measuring up to 13 cm [or 130 mm, in diameter]. This is a huge volume of dead liver tissue, and the necrotic tissue encompasses the porta hepatis. This is shown on a contrast-enhanced CT performed 4/10/2017 immediately after the ablation."[25]

*Erika's life pre-ablation and post-ablation*.  Before undergoing the ablation, Erika was successfully battling her cancer. She had already survived three years and her cancer had been reduced to two tiny lesions that recurred; there was a richness to her life despite her cancer. She went out with her friends, experienced the joy of raising her daughter, enjoyed her loving marriage, managed her home, and attended family functions and vacations.[26] After the ablation, Erika was

---

[21] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 107:14–20).
[22] *See,* Section II.A.2 at p. 9-13, *Infra*.
[23] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 116:3–11, 304:5–8).
[24] **Ex. 30**, Deposition of Dr. Goldberg (v. 1 Tr. 41:17–42:6).
[25] ***Ex. 8**, Report of Dr. Fergus Coakley (p. 3).*
[26] **Ex. 4**, Deposition of Chloe Metz (Tr. 103:3–104:3); **Ex. 1**, Deposition of Scott Powers (Tr. 75:18–76:10, 117:17–118:15).

bedridden when she was not in and out of hospital over the next twenty-eight months—forty separate emergency room visits from May 2017 through July 2019 due to the damage caused by the ablation. Every function of life became exponentially more difficult. Sleepless nights and exhausting days tormented her. She had to surrender almost every source of joy in her life: her art, her friends, the precious moments watching her three-year-old grow and learn, making love to her husband. The ablation performed by Dr. Sofocleous under the auspices of MSK triggered a cascade of events that ended tragically. She died in surgery, at age 39, as Cleveland Clinic transplant surgeons courageously tried to save her life.

## II.    LEGAL STANDARD

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.[27] The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[28] It is the moving party's burden to establish the absence of any genuine issue of material fact.[29] A material fact is one which "might affect the outcome of the suit under the governing law."[30] If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper.[31]

Evidence supporting summary judgment must be admissible to be considered.[32] As detailed in Plaintiff's Motion to Exclude Dr. Theise, Dr. Theise's opinions are inadmissible and should be excluded pursuant to this Court's FRCP 702 expert gate-keeping function.[33] Additionally, none of Defendants' experts' reports are sworn to or contain declarations that comply

---

[27] *Erie R. Co. v. Tompkins*, 304 U.S. 64, 80 (1938); *see also Dallas Aerospace, Inc. v. CIS Air Corp*., 352 F.3d 775, 780 (2d Cir. 2003).
[28] *Wilson v. Nw. Mut. Ins. Co*., 625 F.3d 54, 60 (2d Cir. 2010).
[29] *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).
[30] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).
[31] *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir. 2004).
[32] Fed. R. Civ. P. 36(e); *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013).
[33] *See Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

with 28 U.S.C. § 1746 and therefore they are inadmissible evidence for consideration on summary judgment.[34]

## A.     Medical Malpractice

Under New York law, "In order to establish the liability of a physician for medical malpractice, a plaintiff must prove that the physician deviated or departed from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries."[35] A hospital or other medical facility is liable for the negligence or malpractice of its employees.[36]

The New York Appellate Court has described a departure or deviation from accepted standard of medical practice this way:

> Upon consenting to treat a patient, it becomes [the physician's] duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge. ***The law holds him liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment.***[37]

The trier of fact must determine "the accepted standard of medical practice, whether defendant departed from that standard and, if so, whether such departure was the proximate cause of plaintiff's injuries."[38] To establish proximate cause in a medical malpractice case a plaintiff need only present sufficient medical evidence from which a reasonable person might conclude that it was *more probable than not* that the defendant's departure was a substantial factor in causing the plaintiff's injury.[39]

---

[34] *See Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc.*, No. 19cv9270 (DLC), 2021 WL 2896040, 2021 U.S. Dist. LEXIS 128773 at *13–15 (S.D.N.Y. July 9, 2021); *Quintero v. Rite Aid of N.Y., Inc.*, 09 Civ. 6084 (JLC), 2011 WL 5529818, 2011 U.S. Dist. LEXIS 130920 (S.D.N.Y. Nov. 10, 2011); *In re World Trade Center Disaster Site Litigation*, 722 F.3d 483, 487–88 (2d Cir. 2013); *Yong Qin Luo v. Mikel*, 625 F.3d 772, 777 (2d Cir. 2010).
[35] *Stukas v. Streiter*, 918 N.Y.S.2d 176, 180 (N.Y. App. Div. 2011) (citing *Gross v. Friedman*, 73 N.Y.2d 721, 722–23 (N.Y. 1988); *DiGeronimo v. Fuchs*, 927 N.Y.S.2d 904, 907 (N.Y. Sup. Ct. 2011).
[36] *Bing v. Thunig*, 2 N.Y.2d 656, 666–67 (N.Y. 1957).
[37] *Spadaccini v. Dolan,* 407 N.Y.S.2d 840, 843–44 (N.Y. App. Div. 1978) (emphasis added); *see also Nestorowich v. Ricotta*, 97 N.Y.2d 393, 398 (N.Y. 2002).
[38] *Gross*, 73 N.Y.2d at 722–23.
[39] *Gaspard v. Aronoff*, 61 N.Y.S.3d 240, 243 (N.Y. App. Div. 2017) (emphasis added).

Thus, a physician may deviate from the accepted standards of medical practice by failing to use ordinary and reasonable care, diligence, or skill; *or* failing to use his or her best judgment.[40] The evidence developed by Plaintiff demonstrates that Dr. Sofocleous failed to use his best judgment in his decision to proceed with the ablation and failed to use ordinary and reasonable care, diligence, and skill performing the ablation. Drs. Kemeny and Sofocleous further failed to use their best judgment and failed to use ordinary and reasonable care, diligence, and skill in recommending the liver ablation that led to Erika's death without consulting a multi-disciplinary tumor board. And Dr. Kemeny failed to use her best judgment in failing to consider immunotherapy as an alternative for Erika.  Both Dr. Sofocleous and Dr. Kemeny are employees of MSK, and that fact is not in dispute.

## B.    Lack of Informed Consent

Dr. Sofocleous made no effort to provide meaningful information to Erika to enable her to exercise true informed consent that conformed to New York law. "Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical, dental or podiatric practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation."[41]

To establish a cause of action to recover damages for malpractice based on lack of informed consent, a plaintiff must prove "(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury."[42] A New York State Court put it this way:

---

[40] *See Spadaccini,,* 407 N.Y.S.2d at 843–44; *see also Nestorowich,* 97 N.Y.2d at 398–99.
[41] N.Y. PUBLIC HEALTH LAW § 2805-d [1].
[42] *Figueroa-Burgos .v Bieniewicz,* 23 N.Y.S.3d 369, 371 (N.Y. App. Div. 2016) (quoting *Spano v. Bertocci*, 749 N.Y.S.2d 275 (N.Y. App. Div. 2002); *see N.Y.* PUBLIC HEALTH LAW § 2805-d [1], [3].

> "To state it in other terms, the causal connection between a doctor's failure to perform his [or her] duty to inform and a patient's right to recover exists only when it can be shown objectively that a reasonably prudent person would have decided against the procedures actually performed. Once that causal connection has been established, the cause of action in negligent malpractice for failure to inform has been made out and a jury may properly proceed to consider plaintiff's damages."[43]

Plaintiff has developed evidence that meets each of these elements for lack of informed consent.

## C.    Wrongful Death

New York State Courts have also expounded on what is necessary to establish a cause of action for wrongful death. "[T]he essence of the cause of action for wrongful death in this State is that the plaintiff's reasonable expectancy of future assistance or support by the decedent was frustrated by the decedent's death."[44] In an action to recover damages for wrongful death under New York law a plaintiff must prove: "(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent."[45] To prevail on a cause of action for wrongful death, surviving distributes must demonstrate that they suffered pecuniary loss. Recognized pecuniary injuries under New York law include loss of support, medical and funeral expenses incidental to death, voluntary assistance, and potential inheritance by decedents.[46]

Financial loss is not the only kind of pecuniary contributions wrongful death plaintiffs may recover.  "A spouse is entitled to recover not only for the loss of support from decedent's earning capacity, but also the reasonable value of the household services and family chores decedent would have performed. In addition to support, a child's compensable injuries include the loss of nurture and guidance caused by the death of a parent."[47] The damages include the injury "which a child

---

[43] *Figueroa-Burgos*, 23 N.Y.S.3d at 381 (quoting *Trabal v. Queens Surgi-Center*, 779 N.Y,S.2d 504, 507 (N.Y. App. Div. 2004)); *see* N.Y. PUBLIC HEALTH LAW § 2805-d [3].

[44] *Gonzalez v. New York City Hous. Auth.*, 77 N.Y.2d 663, 668 (N.Y. 1991).

[45] *Chong v. New York City Transit Authority*, 441 N.Y.S.2d 24, 25–26 (N.Y. App. Div. 1981).

[46] *Parilis v. Feinstein*, 49 N.Y.2d 984, 985 (N.Y. 1980).

[47] *In re Estate of Feld*, 582 N.Y.S.2d 922, 923–24 (Sur Ct, New York County 1992) (citing *Tilley v. Hudson Riv. R. R. Co.*, 24 N.Y. 471, 475–76 (N.Y. 1862).

suffers from the loss of the training and instruction which it is entitled to receive from its parents."[48]

## II.    ARGUMENT
### A.  Medical Malpractice
#### 1.   <u>Dr. Sofocleous violated the standard of care by proceeding with the ablation.</u>

Despite the precarious proximity of the lesion to vital structures in the liver, Dr. Sofocleous performed an ablation of a lesion on Erika's liver that was within 4 mm (less than half a cm) of those vital structures.[49] While Dr. Sofocleous contends the lesion was over 1.3 cm away from the hilum and any vital structure located there,[50] Plaintiff's experts refute that claim.[51] Dr. Ronald DeMatteo was Vice Chair of the Department of Surgery and Erika's treating Surgeon while she was at MSK in the spring of 2017.[52] Dr. DeMatteo testified during his deposition that the central tumor was located less than 4 mm away from the hilum. He also  characterized Dr. Sofocleous's interpretation of the films as a "miscalculation."[53] Dr. Sofocleous agrees that when a tumor is within 5 mm of the hilum it is unsafe for thermal ablation.[54]

Dr. DeMatteo testified that the ablation procedure should have never been performed on the central liver tumor given how close it was to the vital structures in the liver.[55] He further testified that the decision to proceed with the ablation at all was a deviation from the standard of care because there was "*no way to perform the procedure safely*."[56] Dr. DeMatteo considered the risk associated with the ablation procedure on a scale of 1 to 10, where 1 is the lowest and 10 is

---

[48] *Id.*

[49] He did so while ignoring his own advice to others in medical articles he authored. **Ex. 5**, Petre, E. & Constantinos S., *Thermal Ablation in the Management of Colorectal Cancer with Oligometastatic Liver Disease*, 33:1 VISCERAL MED. 62, 63 (March 2017); *see* **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 42:18–43:6).

[50] **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 47:3–12).

[51] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 87:2–87:25) (stating that the central tumor was "less than four mm" away from the "confluence of the portal vein, bile duct and hepatic artery"); **Ex. 8**, Report of Dr. Fergus Coakley (p. 1–4) (opining that the central tumor was "only 4 mm away from the hepatic hilum); **Ex. 9**, Report of Dr. Gary Israel (p. 1–3) (stating that the central tumor was within 1 cm of the left portal vein).

[52] **Ex. 2**, Report of Dr. Ronald DeMatteo (p. 1); **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 87:2–87:25, 103:19–104:9).

[53] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 104:11–21).

[54] **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 42:18–43:6).

[55] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 87:2–21, 110:1–25, 226:16–18, and errata at pg. 110:8).

[56] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 131:9–16).

the highest, and testified it was "extremely high, greater than 8 or 9."[57] He maintains that the decision to proceed with the ablation procedure was "a poor decision," ranked "higher than 8 or 9" on a 10-point scale where 10 is the worst.[58]

Contrary to Defendants' representation, Dr. Rakesh Navuluri, Plaintiff's interventional radiology expert, testified that Dr. Sofocleous departed from the standard of care. [59] Dr. Navuluri explained that while ablation, *generally speaking*, is a tool within the standard of care available to interventional radiologists to treat a liver tumor, Dr. Sofocleous' decision to ablate Erika's central liver tumor under these circumstances was inappropriate and poor judgment—rating the decision a "9 out of 10 where 10 is the poorest judgment and 1 is perfect judgment."[60] Dr. Navuluri concludes: "I don't think it was a reasonable procedure to perform in that location."[61] A genuine issue of material fact exist regarding Dr. Sofocleous's judgment in recommending ablation.

### 2. <u>Dr. Sofocleous failed to adhere to the standard of care in performing the ablation.</u>

Dr. Sofocleous failed to use ordinary and reasonable care, diligence, or skill in performing the ablation procedure itself. The two lesions identified on Erika's liver in March 2017 were tiny by medical standards—both roughly 1 x 1.3 cm or 10 mm by 13 mm.[62] The generally accepted objective is to ablate a margin of healthy tissue around the lesion of at least 1 cm to ensure eradication of the malignant cells[63] resulting in an ablation zone of roughly 3 cm (or 30 mm) in diameter.[64] Dr. Sofocleous's April 10, 2017 ablation on Erika, however, resulted in an ablation zone of the central lesion alone measuring ***60 mm in diameter*** and a second ablation zone of the lesion in the periphery of the liver measuring ***50 mm in diameter***.[65] Both Plaintiff's and

---

[57] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 102:23–103:6).
[58] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 109:22–110:25 and errata at pg. 110:8).
[59] **Ex. 10**, Deposition of Dr. Rakesh Navuluri (Tr. 44:4–7).
[60] **Ex. 10**, Deposition of Dr. Rakesh Navuluri (Tr. 190:5:25, 188:5–11).
[61] **Ex. 10**, Deposition of Dr. Rakesh Navuluri (Tr. 177:24–180:12).
[62] Report of Navuluri (P. 17); **Ex. 8**, Report of Dr. Fergus Coakley (p. 3).
[63] **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 40:7–22) (Dr. Sofocleous testified that when he reacha a 10 mm margin, he stops the ablation).
[64] **Ex. 10**, Deposition of Dr. Rakesh Navuluri (Tr. 153:2–23) (Dr. Navuluri rounded up to 40 mm).
[65] **Ex. 34**, Report of Dr. Rakesh Navuluri (P. 17).

Defendants' experts considered this excessive, with Plaintiff's expert Dr. Coakley characterizing it as a "large death zone."[66]

Dr. Sofocleous used the NeuWave microwave ablation machine, made by Ethicon, in the April 10, 2017, ablation.[67] Dr. Sofocleous ignored Ethicon's guidelines and ablated with more probes, at higher settings, and for longer periods of time than Ethicon's recommendations in the NeuWave manual.

Dr. Sofocleous recorded in the medical record that he used two probes and that he ablated each tumor with two, ten-minute ablations ranging from 40 to 50 watts for the left tumor and from 50 to 60 watts for the right tumor. [68] The Ethicon manual recommends ablating a liver tumor with one probe at 30 watts for 10 minutes for an ablation zone of up to 3 cm in diameter when using the probe Dr. Sofocleous utilized in the April 2017 ablation:

30 W Power Setting

| Time | Length (B) | Diameter(A) | Distance Past Tip (C) |
|------|-----------|-------------|----------------------|
| 5 Minutes | 3.0 cm | 2.1 cm | 0.3 cm |
| 10 Minutes | 3.7 cm | 3.0 cm | 0.4 cm |

[69]

The Ethicon manual also warns users that multiple probes create larger ablation zones, and the user must ensure that the area to be ablated is an appropriate size to "***limit the risk of unintended thermal damage.***"[70]  In fact, the Ethicon Manual specifically advises that a 10-minute ablation at 65 Watts with two probes will result in an ablation zone with a 5.1 cm or 51 mm diameter:

Model Certus^PR Probes

2 Probe: 65 W Power Setting in Bovine Liver, Ex-Vivo

| Time | Length (B) | Diameter(A) | Probe Spacing (S) |
|------|-----------|-------------|-------------------|
| 10 Minutes | 5.0 cm | 5.1 cm | 2.0 cm |

[71]

---

[66] **Ex. 8**, Report of Dr. Fergus Coakley (p. 3); *see also* **Ex. 10**, Deposition of Dr. Rakesh Navuluri (Tr. 153:2–23) (The ablation zone in the center of Erika's liver, adjacent to the *porta hepatis* where the vital structures entered the liver "ended up being 113 cubic centimeters.")
[67] *See* **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 145:6–22).
[68] **Ex. 3**, ZAK_NY 015492.
[69] **Ex. 12**, 3PS_Powers_0100; *see also* **Ex. 12**, Declaration of Nicholas Katrana.
[70] **Ex. 12**, 3PS_Powers_0100 (emphasis added); *see also* **Ex. 12**, Declaration of Nicholas Katrana.
[71] **Ex. 12**, 3PS_Powers_0100; *see also* **Ex. 12**, Declaration of Nicholas Katrana.

And that is exactly what occurred.[72]   The April 10, 2017, ablation data recorded by Ethicon revealed that the four probes applied more energy and for longer periods of time than Dr. Sofocleous entered in Erika's chart.[73] The data can be summarized by probe as follows:[74]

| Probe Serial Number | Wattage Range | Total Ablation Time |
|---------------------|---------------|---------------------|
| NM16NCB40628 | 35–65 W | **29.56 Minutes** |
| NM17NCB42612 | 45–50 W | **24.56 Minutes** |
| NM17NCB42605 | 40–65 W | **36 Minutes** |
| NM17NCB42616 | 40–65 W | **26 Minutes** |

The data recorded by the Ethicon software in the microwave ablation machine contradicts Dr. Sofocleous's medical notes and he cannot account for the disparity in the additional time and energy recorded by the Ethicon software.[75] When he recorded the times and temperatures, Dr. Sofocleous did not know the microwave ablation machine software also recorded the ablation times and wattage, or that it automatically transmitted that data to Ethicon via a secure cellular connection.[76]

Dr. Navuluri testified that the use of two probes for "longer than typical ablation times" and at "higher than usual ablation energies" resulted in an ablation zone of the central tumor double the size that was reasonable.[77] Plaintiff's diagnostic radiologist, Dr. Daniel Cousins, further explains that Dr. Sofocleous's probe placement during the April 10, 2017 ablation was "essentially contiguous with the critical structures," and states that "within a reasonable degree of medical probability, there was significant injury to the liver and its associated important structures living within the hepatic hilum (porta hepatis) on an imaging basis as a result of the hepatic ablation that was performed by Dr. Constantinos Sofocleous."[78] Even Defendants' expert pathologist Dr.

---

[72] **Ex. 34**, Report of Dr. Rakesh Navuluri (P. 17).
[73] **Ex. 12**, Declaration of Nicholas Katrana.
[74] **Ex. 12**, Declaration of Nicholas Katrana.
[75] *Compare* **Ex. 12**, Declaration of Nicholas Katrana; *with* **Ex. 3**, ZAK_NY 015492.
[76] **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 156:13–19); **Ex. 12**, Declaration of Nicholas Katrana.
[77] **Ex. 34**, Report of Dr. Rakesh Navuluri (p. 17); **Ex. 10**, Deposition of Dr. Rakesh Navuluri (Tr. 152:15–23).
[78] **Ex. 13**, Report of Dr. Daniel Cousins (p. 7, 8).

Theise concedes that the April 10, 2017, ablation was "clearly associated" with injuries to the hepatic artery, portal vein, and bile ducts, which were seen by a "combination of laboratory findings and radiographic findings."[79]

Defendants' claim that portal vein thrombosis was an "unexpected, unforeseeable and remote risk" of ablation contradicts the medical literature.[80] An article on ablation coauthored by defense expert Dr. Goldberg lists portal vein thrombosis as one of the known "thermal related complications" of ablation, stating "each ablative technique can produce complications" and "it is recommended not to treat patients with biliary-enteric anastomosis and **tumours located less than 1 cm from the main biliary tract**."[81] And while Defendants concede the ablation caused a "severe bile duct injury" that fails to capture the magnitude of the harm Dr. Sofocleous caused. Erika's bile duct was "blown apart" such that there was no drainage into her intestines; it was completely detached and unrepairable.[82] The hepatic artery was bleeding after the ablation and MSK doctors considered embolizing it, a drastic measure, until further testing showed that the bleeding had abated.[83] Dr. Kemeny wrote Sofocleous from her iPhone shortly after the procedure, horrified by what she saw on Erika's radiographic scans: ***"I just looked at this scan. It looks like she's going to die. What's going on?"***[84] Less than twelve weeks later, Erika's hepatic artery ruptured. Paramedics rushed her to the hospital where Dr. John Kaufman of Oregon Health Scient University performed an emergency embolization to save her life.[85]

Plaintiff has established that Dr. Sofocleous (i) used too many probes (one of which was placed contiguous with critical structures in the hilum), (ii) at too high a wattage, (iii) for too long, and (iv) too close to the hepatic hilum at the confluence of the portal vein, hepatic artery, and bile

---

[79] **Ex. 15**, Deposition of Dr. Neil Theise (Tr. 203:17–204:22).

[80] Doc. 229 (p. 22).

[81] **Ex. 16**, Crocetti, L. & Goldberg N., et al., *The Ten Commandments of Liver Ablation: Expert Discussion and Report from Mediterranean Interventional Oncology (MIOLive) Congress 2017*, 22 Eur. Rev. for Med. & Pharmacological Sci. 3896, 3900 (2018) (Goldberg article) (emphasis added).

[82] **Ex. 11**, Kemeny Emails_005–06; *see also* **Ex. 17**, Deposition of Dr. Nancy Kemeny (Tr. 160:23–161:4).

[83] **Ex. 11**, MHCAD Emails 0005, 0025, 0109; **Ex. 17**, Deposition of Dr. Nancy Kemeny (Tr. 69:5–70:14, 177:4–178:18, 179:15–180:10).

[84] **Ex. 11**, MHCAD Emails 0109 (emphasis added); *see also* **Ex. 17**, Deposition of Dr. Nancy Kemeny (Tr. 179:15–180:10).

[85] **Ex. 2**, Report of Dr. Ronald DeMatteo (p. 12).

12

duct—the critical structures the liver relies on to function. The result was irreparable damage to these critical structures. When these critical structures sustain irreparable damage, the liver fails. A genuine issue of material fact exists as to whether Dr. Sofocleous used reasonable care, diligence, or skill in performing the ablation procedure.

### 3.   MSK should have required that Erika's case be presented to a multidisciplinary tumor board.

Dr. Navuluri did not, as Defendants claim, agree "that presenting Ms. Zak's case to a MDTB prior to the ablation was not mandatory or required by the standard of care."[86] On the contrary, he opined that Drs. Sofocleous and Kemeny *should have presented* this case to a multidisciplinary tumor board.[87] Their failure to have done so raises a genuine issue of material fact  as to whether they used ordinary and reasonable care and diligence or their best judgment.[88]

Dr. Navuluri states that while the standard of care may not require doctors to present *every* patient decision to a tumor board, Erika was at a treatment juncture and Drs. Sofocleous and Kemeny should have discussed the decision to ablate with other multi-disciplinary professionals.[89] After all, MDTBs exist for this very purpose—to address complex cases like Erika's and prevent miscalculations in image findings.[90] If Dr. DeMatteo had been consulted prior to the ablation procedure, as would have occurred had an MDTB considered Erika's case, Dr. DeMatteo testified that "the procedure wouldn't have happened."[91]

Defendants' own Interventional Radiologist expert, Dr. Goldberg published a paper entitled "The Ten Commandments of Liver Ablation."[92] The very first Commandment? "Discuss the Case at a Multidisciplinary Tumor Board (MDTB): The indication for ablation of a liver tumor should come from a MDTB discussion and should be clearly articulated in a concurrent manner by the interventional radiologist, oncologist, hepatologist, and liver surgeon."[93] Dr. Goldberg sheepishly tried to walk back the recommendations in his article, but the peer reviewed medical article speaks volumes. Even Dr. Kemeny conceded that Erika's case was appropriate for a MDTB:

> **Q.** Given the risk of a thermal ablation because of where the lesion was located in the liver so close to the hilum, it made sense to present this case to a multi-disciplinary tumor board for advice on what options might be available…..true?

---

[86] *See* Doc. 229 (p. 18).
[87] **Ex. 34**, Report of Dr. Rakesh Navuluri (p. 12).
[88] *See Spadaccini*, 407 N.Y.S.2d at 843–44; *see also Nestorowich*, 97 N.Y.2d at 398–99.
[89] **Ex. 34**, Report of Dr. Rakesh Navuluri (p. 12).
[90] **Ex. 18**, Deposition of Dr. Skye Mayo (Tr. 22:4–22).
[91] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 107:14–20).
[92] **Ex. 30**, Deposition of Dr. Goldberg (v. 2 Tr. 43:6- 57:12).
[93] **Ex. 10**, Goldberg article at 3897 (emphasis added).

**A**. Yeah, I think it would -- it -- it would have been something you'd present and -
. . . -- take it. Yes.
**Q.**    Do you agree -- do you agree multi-disciplinary cooperation is in -- is
essential for the management of cancer?
**A.**    Yes."[94]

This raises a genuine issue of material fact as to whether Drs. Sofocleous and Kemeny should have

presented her case to a multi-disciplinary tumor board before proceeding with the ablation.

### 4.   MSK's Dr. Kemeny failed to consider other viable alternative treatments to chemotherapy or ablation such as immunotherapy.

Dr. Kemeny failed to consider or discuss Pembrolizumab ("Pembro") immunotherapy as

an alternative treatment for Erika. Pembro is most effective in patients who are considered "MSI-

high" or "MMR-deficient."[95] In 2014, Dr. Ko, Erika's doctor at University of California at San

Francisco Health noted in Erika's medical record in April of 2014 that Erika's cancer was "MMR-

Deficient, with loss of PMS2."[96] This is suggestive of MSI-high status in 93% of patients.[97] Dr.

Kemeny's failure to consider and discuss immunotherapy departed from the standard of care by

failing to use ordinary and reasonable care and her best judgment.[98]

The viability of immunotherapy was not lost on doctors at Oregon Health & Science

University (OHSU) who assumed Erika's care beginning in May 2017. They recognized the loss

of PMS2 as "virtually interchangeable" with MSI-high status making Erika a strong candidate for

immunotherapy. Dr. Charles Lopez, Erika's medical oncologist at OHSU, began immunotherapy

Pembro.[99]   Erika had a "fantastic" response.[100] Dr. Kemeny and MSK failed Erika by never

considering that she might have been MSI-high, ordering additional testing, and suggesting

Pembro. There exists a genuine issue of material fact as to whether Dr. Kemeny failed to use her

best judgment in considering and presenting Erika with the alternative of Pembro immunotherapy

before referring her for ablation.

---

[94] **Ex. 17**, Deposition of Dr. Nancy Kemeny (Tr. 112:13–113:3).
[95] **Ex. 21**, Report of Dr. Rubinson's (p. 8–9).
[96] UCSF Health Records (p. 435–41).
[97] **Ex. 21**, Report of Dr. Rubinson's (p. 5–6, 9).
[98] *See Spadaccini*, 407 N.Y.S.2d at 843–44; *see also Nestorowich*, 97 N.Y.2d at 398–99.
[99] **Ex. 3**, ZAK_NY 002893–95.
[100] **Ex. 3**, ZAK–NY 001021.

15

### B. Medical Malpractice and Wrongful Death—Causation

#### 1. Erika's liver failure and subsequent death were a direct result of the damage Dr. Sofocleous caused to Erika's liver during the ablation procedure.

New York law supports a finding of proximate cause for medical malpractice claims when plaintiffs "present sufficient medical evidence from which a reasonable person might conclude that it was more probable than not that the defendant's departure was a substantial factor in causing the plaintiff's injury."[101] The injury caused to Erika's liver by the ablation procedure need not be the *only* cause;  it must only be a substantial factor in causing her injury and subsequent death to be legally sufficient.  Nonetheless, the evidence shows that the ablation procedure alone caused Erika's liver failure, necessitating the liver transplant surgery which Erika did not survive.

Plaintiff's experts support this factual conclusion. Dr. DeMatteo assessed the before and after films of Erika's liver almost immediately after the April 10, 2017 ablation.[102] He concluded that the ablation damaged Erika's portal vein, hepatic artery, and common biliary duct.[103] Dr. DeMatteo stated that, "the damage to the liver was catastrophic."[104] Dr. DeMatteo testified that Erika's liver function failed because of the injury she sustained during the April 10, 2017 ablation and that he is "amazed she lived as long as she did."[105] He further clarified that "she would not have had the injury if she hadn't had the ablation."[106] Dr. Navuluri characterized the result of the ablation as, "a catastrophic outcome. I have never seen an ablation with this degree of damage to the liver before. Quite shocking, actually."[107] Dr. Coakley opines that the ablation resulted in an "large death zone" in the central liver that measured *13 cm* (130 mm).[108] Dr. Daniel Cousins, a diagnostic radiologist for Plaintiff, further explains that "within a reasonable degree of medical probability, there was significant injury to the liver and its associated important structures living

[101] *Gaspard,* 61 N.Y.S.3d at 243.
[102] **Ex. 2**, Report of Dr. Ronald DeMatteo (p. 13).
[103] *Id.* at 12–16.
[104] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 111:3–117:17).
[105] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 126:20–127:5).
[106] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 128:1–3).
[107] **Ex. 10**, Deposition of Dr. Rakesh Navuluri (Tr. 181:19–24).
[108] **Ex. 8**, Report of Dr. Fergus Coakley (p. 3) (emphasis added).

within the hepatic hilum (porta hepatis) on an imaging basis as a result of the hepatic ablation that was performed by Dr. Constantinos Sofocleous."[109]

It is well established that at the time of Erika's death "there was no threat to her life based on her -- on the status of her cancer [be]cause it was under control."[110] Despite Defendants' claim that Erika was "failing chemotherapy" in March of 2017,[111] Dr. Sofocleous specifically told Erika that Dr. Kemeny was "controlling [the disease] overall reasonably well" and that "having one or two ablations a year is not considered failure."[112] Nor is there any evidence to support Defendants' argument that "Ms. Zak was also suffering from the cumulative and toxic effects" of chemotherapy.[113] All pathological material from Erika's liver prior to the April 10, 2017 ablation showed an "absence of biliary or other abnormalities."[114]

The medical records and treating physicians also agree that the ablation in April 2017 caused Erika's liver failure and need for a transplant. Dr. Skye Mayo, Erika's surgical oncologist at OHSU summarized Erika's condition and the destruction the ablation caused to her liver in a letter to United Healthcare, stating:

> Initially, Erika had an excellent result from a hepatic arterial infusion in combination with systemic therapy and had excellent disease control. She underwent a percutaneous ablation of a liver lesion in her central liver. Unfortunately she had significant complications including hepatic arterial and portal venous bleeding requiring embolization of the vessels. ***She developed a significant bile leak with evidence of complete destruction of the biliary hilum junction of her right and left bile ducts with extensive central liver injury.*** She transferred her care to OHSU in April 2017 and I have been caring for her along with Dr. Charles Lopez since that time helping to manage her biliary drains and her evolving liver injury. . . . Unfortunately the extent of her central liver and biliary injury has necessitated multiple admissions to the hospital with percutaneous biliary drains placed and exchanges to address the complex central biloma. The injuries she sustained to her central liver, biliary system, portal venous system, and hepatic arterial system does not have a technical solution to repair the injury outside of a liver transplant. . . . Ms. Zak's case is becoming increasingly more urgent as

---

[109] **Ex. 13**, Report of Dr. Daniel Cousins (p. 7, 8).
[110] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 130:13–16).
[111] Doc. 229 (p. 18–19).
[112] **Ex. 19**, March 22, 2017, Dr. Constantinos Sofocleous Transcript (Tr. 4:3–12).
[113] Doc. 229 (p. 19).
[114] **Ex. 20**, Report of Dr. Neil Theise. (p.4).

she is suffering from the portal hypertension that accompanies significant central liver and biliary injury and has multiple bleeding variceal episodes requiring both hospitalization and endoscopic intervention.[115]

In September of 2017, Dr. Mayo wrote that Erika "continues to struggle with her biloma and percutaneous biliary drains. Fortunately she is having an excellent response to pembrolizamab [Pembro immunotherapy] and her disease is well-controlled. Her biggest challenge remains her biloma."[116] Dr. Mayo made clear to Dr. Nancy Kemeny that progressing disease was not the cause obstructing her ducts:[117]

> She does not have any tumor obstructing her ducts. . . . She is jaundiced because her bile ducts were completely blown apart from the [ablation] at the confluence of the right and left hepatic duct effectively detaching them from her common bile duct. This is her main problem and is the greatest danger to her life. She has a large central biloma that we have to drain into through her right system as well as an internal/external drain through her left system. . . . It has been very challenging with her recurrent cholangitis and biliary injury to even consider any type of systemic treatment for her.[118]

Contrary to Defendants' claims, Dr. Mayo does not "directly repudiate Plaintiff's claim that Ms. Zak's central liver, her biliary system, her portal vein system, and her hepatic arterial system were irreparably damaged because of the ablation."[119] To the contrary, Dr. Mayo states that Erika's- eventual clinical course was the result "the initial injury that she had [from the ablation], but also her **subsequent treatments to address that evolving nature of the injury**."[120] Dr. Mayo specifically points to such subsequent treatments, the embolization and biliary drains, in the prior page of his testimony.[121]

Likewise, Dr. DeMatteo, Erika's surgeon at MSK, testified he does not agree "that Erika had liver dysfunction attributed to complications of her chemotherapy and surgeries as well as her

---

[115] **Ex. 3**, ZAK_NY 001002–03 (emphasis added).
[116] **Ex. 3**, ZAK_NY 003199.
[117] **Ex. 11**, Kemeny Emails_005–06; *see also* **Ex. 17**, Deposition of Dr. Nancy Kemeny (Tr. 160:23–161:4).
[118] *Id.*
[119] Doc. 229 (p. 23–24). Moreover, to the extent Defendants rely on Dr. Mayo's testimony as an expert, they failed to properly designate him as such in accordance with the Court's Order for designating treating physicians as expert witnesses. *See* Court's Order and Memo Endorsement at Doc. 81 and 95.
[120] **Ex. 18**, Deposition of Dr. Skye Mayo (Tr. 42:24–43:3) (emphasis added).
[121] **Ex. 18**, Deposition of Dr. Skye Mayo (Tr. 41:25–42:21).

tumor because it does not include what caused the cascade of damage—the ablation."[122] Dr. DeMatteo's opinion is that "The ablation of Erika's bile ducts, portal vein, and hepatic artery was the most substantial factor that caused the cascade of damage to her liver that caused her liver dysfunction."[123]

Dr. Charles Lopez of OHSU also agreed that Erika's liver injury was caused by the ablation procedure.[124] Dr. John Kaufman of OHSU, who performed the emergency embolization of Erika's hepatic artery twelve weeks after the ablation, clarified to Dr. Mayo, his colleague at OHSU, that he embolized the proper hepatic artery near the hepatic hilum, not the common hepatic or gastroduodenal artery where the HAI pump was placed and the FUDR entered Erika's liver, noting "she has had patent hepatic artery for a while."[125] This evidence raises a genuine issue of material fact that Erika's ablation-related injury was the proximate cause of the damage necessitating a transplant.[126]

The need for a liver transplant is determined by a Model for End-Stage Liver Disease (MELD) score, ranging from 6 to 40, using indicators of liver function from a liver panel: international normalized ratio (INR), bilirubin, and creatinine.[127] This score is used specifically for "evaluation in patients with underlying cirrhosis to determine eligibility for liver transplantation."[128] Prior to the ablation, Erika's INR, bilirubin, and creatinine remained stable and unelevated, and her MELD score was 6, the lowest possible score.[129] Erika's MELD score after the ablation was 30.[130] UNOS recognized that Erika was "currently in liver failure due to complications related to a previous ablation procedure in 2017."[131]

---

[122] **Ex. 2**, Report of Dr. Ronald DeMatteo (p. 16).
[123] **Ex. 2**, Report of Dr. Ronald DeMatteo (p. 16).
[124] **Ex. 23**, Deposition of Dr. Charles Lopez (Tr. 71:9–13).
[125] **Ex. 11**, Kemeny Emails_009–10; *see also* **Ex. 17**, Deposition of Dr. Nancy Kemeny (Tr. 162:18–164:13).
[126] **Ex. 3**, ZAK_NY 001002–03.
[127] **Ex. 24**, Deposition of Dr. Bernstein (Tr. 150:12– 20).
[128] **Ex. 24**, Deposition of Dr. Bernstein (Tr. 149:14–25).
[129] *See* **Ex. 3**, ZAK_NY 007252–53; **Ex. 24**, Deposition of Dr. Bernstein (Tr. 80:9–85:11, 53:8–59:17).
[130] See **Ex. 3**, ZAK_NY 003245. A May 2019 policy change recalibrated how to calculate the MELD score that adjusted Erika's score to 25 but recognized her "continuously deteriorating condition" and recent ICU admission for a "major variceal bleed. *See also* **Ex. 26**, August 8, 2019, UNOS record (p. 1–3).
[131] **Ex. 26**, August 8, 2019, UNOS record (p. 1–3).

Defendants latch on to a single statement made by Dr. Robert Pelley in the Cleveland Clinic records from June 2018, more than a year after the ablation procedure, stating that "liver dysfunction was all secondary to complications of her chemotherapy and surgeries as well as her tumor."[132] What Defendants fail to disclose to the Court is that this statement was later corrected in the Cleveland Clinic records, including a note signed by Dr. Robert Pelley on July 2, 2018— **"Liver failure related to biloma and surgeries, not thought to be related to chemotherapy."**[133]

Defendants' theory that Erika's liver failure was caused by FUDR administered via the hepatic arterial infusion pump (FUDR/HAI) rests on inaccurate conclusions of a posthumous diagnosis by their imaginative pathologist. The facts and the medical literature belie this claim. The biopsy taken contemporaneously during the April 10, 2017, ablation shows **no evidence of bile duct injury**.[134] In fact, not a single entry in Erika's extensive medical record provides any indication her liver was failing **before** the ablation. Defense expert Dr. Theise conceded that the **only** evidence in Erika's medical record of progressive biliary disease is an elevation of one liver enzyme (ALK) on her blood panel from her baseline in the mid-100s to the high-100s.[135] But as Dr. Bernstein, another defense expert, testified "There are lots of different causes for an elevated [ALK]."[136] Dr. Bernstein testified further: "I don't think the [ALK] is all that of an important number. . . We look at liver tests of which [ALK] is one in the context of what's going on with a patient. A patient isn't necessarily sicker because the [ALK] is 200, 300 or 400 and **an [ALK] is not a test of liver function**."[137] Dr. Bernstein explains that it is normal for someone with this type of disease to have their ALK fluctuate over time because of procedures, medications, or the tumors themselves.[138] Immediately following the ablation, Erika's ALK skyrocketed to a baseline in the mid-300s and never returned to its pre-ablation baseline.[139]

---

[132] Doc. 229 (p. 25).
[133] *See* **Ex. 3**, ZAK_NY 016325–26.
[134] **Ex. 15**, Deposition of Dr. Neil Theise (Tr. 171:16–20).
[135] **Ex. 15**, Deposition of Dr. Neil Theise (Tr. 181:5–13).
[136] **Ex. 24**, Deposition of Dr. Bernstein (Tr. 75:4–16).
[137] *Compare* **Ex. 24**, Deposition of Dr. Bernstein (Tr. 78:9–79:6) (emphasis added); *with* Doc. 229 (p. 24).
[138] **Ex. 24**, Deposition of Dr. Bernstein (Tr. 74:24–75:16).
[139] **Ex. 15**, Deposition of Dr. Neil Theise (Tr. 176:23–177:2); **Ex. 24**, Deposition of Dr. Bernstein (Tr. 80:5–8).

The Defense pathologist, Dr. Theise, maintains the unreliable opinion that the diffuse bile duct injuries in Erika's liver are unequivocal proof that Erika's liver failure was primarily caused by FUDR/HAI.[140] There is no support for this claim in the scientific literature or Erika's medical record.[141] Even Dr. Kemeny states in peer-reviewed publications *she authored* that biliary strictures (narrowing of the bile ducts) is "an uncommon complication after [FUDR/HAI] and does not compromise survival if adequately salvaged by stenting or dilatation."[142] The peer reviewed medical literature further notes that "dose reduction or stopping [FUDR/HAI] when increased liver function tests (LFTs) are noted" prevent biliary strictures.[143] There is no legitimate, objective medical support for Defendants' litigation-based theory that her HAI pump caused her liver failure. Defendants cite no reported instances in the medical literature in which contemporary patients receiving HAI-FUDR for stage-IV colon cancer have developed end-stage cirrhosis that required a liver transplant.

Defense expert Dr. Theise testified that Erika's liver was failing after the ablation and "To a reasonable degree of medical certainty, she would die of liver failure eventually unless she died of something else before."[144] Defense experts Dr. Theise and Dr. Bernstein agreed with Dr. Sofocleous that there was no evidence that Erika was going into liver failure before the ablation,[145] despite Dr. Theise's irreconcilable opinion that her liver failure coincidentally began immediately following the ablation but was caused by chemotherapy toxicity, not the ablation.

Dr. Bernstein conceded that none of Erika's imaging or lab reports evidenced liver failure *before* the April 10, 2017 ablation; after the ablation Erika experienced portal vein thrombosis, hepatic artery thrombosis and injury eventually requiring embolization of her hepatic artery,

---

[140] **Ex. 15**, Deposition of Dr. Neil Theise (Tr. 117:19–122:4).

[141] Defendant's expert Dr. Sadler could not point to any such authority. *See* **Ex. 28**, Deposition of Dr. Sadler (Tr. 24:1–28:14, 41:21–42:25, 53:19–56:9).

[142] **Ex. 25**, Ito, K., & Kemeny, N., et al., *Biliary Sclerosis after Hepatic Arterial Infusion Pump Chemotherapy for Patients with Colorectal Cancer Liver Metastasis: Incidence, Clinical Features, and Risk Factors*, 19 ANNALS SURGICAL ONCOLOGY 1609, 1609–10 (2012).

[143] *Id.*

[144] **Ex. 15**, Deposition of Dr. Neil Theise (Tr. 57:10–13).

[145] **Ex. 15**, Deposition of Dr. Neil Theise (Tr. 170:12–23); **Ex. 24**, Deposition of Dr. Bernstein (Tr. 147:6–23), **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 98:8–99:2).

evisceration of her common biliary duct, elevated bilirubin, portal hypertension, ascites, elevated liver enzyme levels, weight loss, and an elevated MELD score.[146]  None of these indicia of damage returned to the levels or condition they were pre-ablation.[147] Erika's bile ducts and liver health only began to deteriorate immediately after the ablation and did not improve with the cessation of FUDR/HAI treatment. Nor was stenting or dilation sufficient to salvage the injury. Immediately following the ablation, she did not just have bile duct strictures, her bile ducts were "blown apart," *fully disconnected from her intestines*, and she developed a large biloma and central liver injury that required constant medical intervention.[148] There was, in fact, no surgical repair available to fix the bile duct injury Dr. Sofocleous caused during the April 10, 2017, ablation.[149] The evidence in the record raises a genuine issue of material fact regarding whether the ablation was the cause of Erika's liver failure.

### C. Lack of informed consent

#### 1. Dr. Sofocleous failed to inform Erika of reasonably foreseeable risks which a reasonable physician would have discussed

Because a recording of the consultation with Dr. Sofocleous exists, we have the transcript of what he discussed with Erika about the procedure.  We know he did not have "a very detailed discussion with the patient about the risks, benefits and alternatives of image guided ablation."[150] We know he did not discuss a single alternative with Erika.[151] Indeed, Dr. Sofocleous did not "discuss all risks including but not limited to bleeding infection injury to bile ducts requiring drainage as well as injury to the liver or the lung requiring thoracostomy."[152] He never mentioned the possibility of drains, or injury to the liver in the informed consent meeting.[153] Dr. Sofocleous

---

[146] **Ex. 24**, Deposition of Dr. Bernstein (Tr. 176:24–177:5, 177:5–180:6, 47:12–88:12).
[147] *Id.*
[148] **Ex. 11**, Kemeny Emails_005–06; *see also* **Ex. 17**, Deposition of Dr. Nancy Kemeny (Tr. 160:23–161:4). Or as Dr. Theise puts it her bile ducts were not "communicating" with her intestines. **Ex. 15**, Deposition of Dr. Neil Theise (Tr. 87:23–94:9).
[149] **Ex. 3**, ZAK_NY 003040–49 (the multidisciplinary tumor board referenced by Dr. Skye Mayo took place on January 29, ***2018***).
[150] **Ex. 3**, ZAK_NY 012331.
[151] **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 47:17–49:2, 256:4–7).
[152] *See* **Ex. 19**, March 22, 2017, Dr. Constantinos Sofocleous Transcript.
[153] *See id.*

also did not "indicate that due to PET avid metastasis can't be ablated with margins" during the consent visit.[154] And, he did not even mention margins at all during the consent meeting.[155]

Dr. Sofocleous noted that "A total of 55 minutes was spent face-to-face with the patient. More than half of this time was spent in counseling the patient and/or coordinating their care as described."[156] This is false. The recording of the consultation reveals that the consultation was actually just over twelve minutes in length.[157] Dr. Sofocleous spent a total ***three seconds*** covering risks in the meeting: "As you know, risk, bleeding, infection, injury to bile duct."[158] Yet he never bothered to explain what any of that meant or how great a risk existed.

This represents another written representation by Dr. Sofocleous that the objective record reveals is untrue. Dr. Sofocleous handed Erika Informed Consent form and said "All right. You should sign your name right here for the ablation, first line. And then I'll examine you."[159] Even if Dr. Sofocleous had uttered the words "liver injury" or "liver damage" or even "liver" (which he did not), that is inadequate to inform Erika of the specific risks of the procedure because, as Defendants' Expert Dr. Goldberg explained, the term "liver injury" is so nonspecific it could mean, "Eating three donuts for dessert."[160] Despite Dr. Sofocleous' testimony that he "could cover [everything Erika needed to know] in two minutes,"[161] the recording demonstrated, and Chloe testified, that "There were no substantive discussions about the procedure or risks or what Erika might be feeling, none of that."[162] This fails to conform to the legal standard for adequate informed consent under New York law and raises a genuine issue of material fact regarding whether Erika gave "informed" consent to proceed with the ablation.

---

[154] *See id.* Dr. Sofocleous claims that this sentence is a typo—that "can't" should read "can. **Ex. 6,** Deposition of Dr. Constantinos Sofocleous (Tr. 124:24–125:7).

[155] *See* **Ex. 19,** March 22, 2017, Dr. Constantinos Sofocleous Transcript.

[156] **Ex. 3,** ZAK_NY 012331.

[157] **Ex. 4,** Deposition of Chloe Metz (Tr. 25:3–24).

[158] **Ex. 19,** March 22, 2017, Dr. Constantinos Sofocleous Transcript (Tr. 2:19–21).

[159] **Ex. 11,** March 22, 2017, Dr. Constantinos Sofocleous Transcript (Tr. 17:16–18).

[160] *See* **Ex. 30,** Deposition of Dr. Goldberg (v. 1 Tr. 97:11–99:16); *see also* **Ex. 10,** Deposition of Dr. Rakesh Navuluri (Tr. 60:1–4) ("I would never use the term "liver injury" personally, because it's so vague.").

[161] **Ex. 6,** Deposition of Dr. Constantinos Sofocleous (Tr. 128:10–15).

[162] **Ex. 4,** Deposition of Chloe Metz (Tr. 26:17–19).

The central tumor was in a dangerous location for ablation. Dr. Sofocleous should have explained this "extremely high" risk before the ablation[163]. By failing to do so, he failed to describe risks that reasonable physicians would have discussed with Erika.[164]

### 2. Dr. Sofocleous failed to present the alternatives that reasonable physicians would have disclosed.

Dr. Sofocleous failed to discuss a single alternative, and reasonable physicians have disagreed with his decision.[165] Dr. Sofocleous claims that because, in his opinion, ablation was better than any other option, he did not have to disclose any alternatives to Erika.[166] This is contrary to New York law of Informed Consent.

Specifically, Drs. DeMatteo and Navuluri would have presented *any* other alternative, since the decision to proceed with an ablation at all was poor judgment given Erika's extreme risk associated with ablation of the central tumor.[167]

Multiple viable alternatives were available that Dr. Sofocleous never disclosed to Erika. For example, Dr. DeMatteo testified that radioembolization, radiation, and irreversible electroporation were alternatives that Dr. Sofocleous should have discussed with Erika in March of 2017 because these alternatives would have been safer options for Erika's central tumor.[168] Specifically, Dr. DeMatteo stated that he does not believe Erika would have had the kind of injury she suffered from the ablation with radioembolization.[169] Dr. Navuluri said he would have offered radiation segmentectomy over ablation because radiation segmentectomy would have been a better option for the lesion which was near vital structures.[170] Dr. Sofocleous himself admits that

---

[163] **Ex. 10,** Deposition of Dr. Rakesh Navuluri (Tr. 46:14–47:17).
[164] *See* **Ex. 2**, Report of Dr. Ronald DeMatteo (p. 9–10); **Ex. 10,** Deposition of Dr. Rakesh Navuluri (Tr. 177:24–180:12).
[165] *See* **Ex. 30**, Deposition of Dr. Goldberg (v.1 Tr. 15:23–17:24).
[166] **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 47:17–49:2, 256:4–7).
[167] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 226:16–18;) **Ex. 10,** Deposition of Dr. Rakesh Navuluri (Tr. 177:2–180:12).
[168] **Ex. 2**, Report of Dr. Ronald DeMatteo (p. 9–10).
[169] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 132:20–22).
[170] **Ex. 10,** Deposition of Dr. Rakesh Navuluri (Tr. 177:24–180:12).

radiation segmentectomy would "conceivabl[y]" be a lower risk alternative to ablation.[171] Dr. Sofocleous never discussed any of these alternatives with Erika.

Erika was not evaluated for surgical options by her surgeon or presented surgery as an alternative.[172] That should not be in dispute since Dr. DeMatteo was her surgeon and he testified he did not evaluate her for surgery to address that lesion. Erika was not evaluated for radiation segmentectomy as an alternative,[173] nor was she evaluated by a radiation oncologist for other options such as focal radiation[174] or Stereotactic Body Radiation Therapy (SBRT); nor did Sofocleous discuss irreversible electroporation ("IRE" or "NanoKnife") as an alternative.[175] Nor did Dr. Kemeny carefully evaluate Erika for immunotherapy while at Memorial,[176] as we have described above, or for any other chemotherapy options listed by Defendants own expert as potential options.[177]

There is no dispute that Dr. Sofocleous failed to discuss with Erika any of the alternatives that a reasonable physician would have disclosed because Dr. Sofocleous admits he did not do so.[178] One purpose of New York's statute requiring a physician to discuss reasonable alternatives is to set a standard designed to prevent a doctor from unilaterally dismissing all alternatives in favor of his preferred course of treatment, absolving him of the need to present any alternatives. Otherwise, a doctor would never have to discuss alternatives, turning the doctrine of informed consent on its ear. That is not supported by law or common sense.

Moreover, nothing in New York law provides that informed consent is an accumulative process.  Just because a patient provided informed consent eight months earlier does not relieve her doctors from obtaining additional informed consent for subsequent treatment. Never mind that

---

[171] **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 49:12–50:7).
[172] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 224:7–20).
[173] **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 34:21–50:7).
[174] **Ex. 7**, Deposition of Dr. Ronald DeMatteo (v. 2, Tr. 226:9–15).
[175] **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 33:20–34:20) (Dr. Sofocleous agrees that IRE was an alternative available to Erika and that IRE "has an advantage over thermal ablation, particularly in proximity to at-risk structures such as the biliary tree.").
[176] *See* **Ex. 21**, Report of Dr. Rubinson (p. 5–6, 9).
[177] **Ex. 21**, Report of Dr. Rubinson (p. 6–8).
[178] **Ex. 6**, Deposition of Dr. Constantinos Sofocleous (Tr. 236:16–22).

the risks and reasonable alternatives of the April 10, 2017, ablation were not the same as the risks and reasonable alternatives of the ablation Erika underwent in August 2016, due to the specific location of the central tumor targeted for ablation in 2017. For all these reasons, genuine issues of material fact exist as to whether Dr. Sofocleous complied with New York's legal standard for informed consent.

### 3. A reasonable person would not have undergone the procedure if adequately informed of the risks and alternatives, and the evidence supports that Erika would have behaved as a reasonable person.

A primary focus of modern medicine is a patient-centered approach, which requires shared decision-making between a doctor and patient.[179] Dr. Sofocleous did not describe the specific risks of the ablation procedure to Erika, and he did not present any alternatives or other care options.[180] As Dr. DeMatteo stated:

> a reasonably prudent person who understood the risk posed to her critical structures in her liver, based on the location of the lesion, if they knew the details, at least as how I perceived the details, that they would not undergo the procedure. Knowing Erika as I did, in my opinion, Erika would have acted as a reasonably prudent person in deciding whether to undergo the image-guided thermal ablation on April 10, 2017, and I think if I had explained my viewpoint, she would not have had the procedure.[181]

In March of 2017 Erika was concerned about the benefits and risks of treatment options and considered both when seeking the best course of treatment, including seeking additional chemotherapy options.[182]   The evidence in this case creates a genuine issue of material fact regarding whether Erika would have behaved as a reasonably prudent person and either accepted or rejected the risks of this procedure if Dr. Sofocleous had adequately informed her of the risks as well as the available alternatives.

---

[179] **Ex. 30**, Deposition of Dr. Goldberg (v.1 Tr. 94:3–21).
[180] **Ex. 30**, Deposition of Dr. Goldberg (v. 1 Tr. 122:18–123:17).
[181] **Ex. 2**, Report of Dr. Ronald DeMatteo (p. 11).
[182] **Ex. 4**, Deposition of Chloe Metz (Tr. 70:7–13); **Ex. 19**, March 22, 2017, Dr. Constantinos Sofocleous Transcript (Tr. 4:1–12).

### 4.   MSK can be held liable for its employees' failure to obtain informed consent.

Defendants claim that "only the physician who performed the ablation, Dr. Sofocleous, may be liable for failure to obtain informed consent" is unfounded.[183] "A hospital may be subject to secondary liability under Section 2805-d of New York's Public Health Law where a medical practitioner it employs provides medical treatment without obtaining informed consent from the patient."[184] In the case cited by Defendants, *Hoemke v. New York Blood Center, et al.*, the plaintiff brought a negligence claim against the hospital directly, claiming the hospital negligently failed to adopt procedures for obtaining patients' informed consent."[185] In *Hoemke*, the claim of primary liability against the hospital was dismissed because a hospital may not itself be held directly liable "in negligence for the alleged failure to encourage its physicians to obtain informed consent."[186] However, a hospital can be held vicariously liable for lack of informed consent when the physician who failed to obtain informed consent was the hospital's employee.[187] Drs. Sofocleous and Kemeny were employees of Defendant MSK at the time he failed to obtain informed consent from Erika in advance of the April 10, 2017, ablation.[188] Defendant MSK is subject to secondary liability under Section 2805-d for its employee's failure to obtain informed consent. Moreover, even if MSK is only vicariously liable for its employees' failure to comply with the law of Informed Consent, MSK is directly liable for its failure to require a case such as Erika's be presented to a multi-disciplinary tumor board for consideration before proceeding with the ablation.

### D.   Damages

#### 1.   Plaintiff is entitled to the damages he has plead.

*Plaintiff may recover damages for medical malpractice and lack of informed consent claims.* Plaintiff plead for his loss of consortium, not as a damage for his wrongful death claim,

---

[183] Doc. 229 (p. 26).
[184] *Gotlin v. Lederman,* 367 F. Supp. 2d 349, 361 (E.D.N.Y. 2005).
[185] *Id.*
[186] *Hoemke v. New York Blood Center, et al.*, No. 88 CIV. 929(RO), 1989 WL 147642 at *6 (S.D.N.Y. Nov. 28, 2989).
[187] *Gotlin,* 367 F. Supp. 2d at 361; *Salandy v. Bryk*, 55 A.D.3d 147, 154 (N.Y. App. Div. 2008) (holding that whether the hospital was liable for the doctor's failure to obtain informed consent is a triable issue of fact); *Hill v. St. Clare's Hosp.*, 67 N.Y.2d 72, 79 (N.Y. 1986) ("…A hospital or other medical facility is liable for the negligence or malpractice of its employees); *see also Bailey v. Owens*, 17 A.D.3d 222, 223 (N.Y. App. Div. 2005); *Sita v. Long Island Jewish-Hillside Med. Ctr.*, 22 A.D.3d 743, 743 (N.Y. App. Div.).
[188] Doc. 229 (p. 29).

but as derivative of Erika's medical malpractice and lack of informed consent claims, which Plaintiff brings as representative of her estate. Plaintiff is entitled to bring the derivative claim for loss of consortium, as he was married to Erika at the time Defendants caused Erika's injury that led to her death.[189] A loss of consortium claim "is designed to compensate for the injury to the marital relationship and the interest of the injured party's spouse in the continuance of a healthy and happy marital life."[190] The claim includes "not only loss of support or services [but] it also embraces such elements [of] love, companionship, affection, society, sexual relations, solace and more."[191]

*Plaintiff may recover damages for Wrongful Death.* In a wrongful death case "A spouse is entitled to recover not only for the loss of support from decedent's earning capacity, but also the reasonable value of the household services and family chores decedent would have performed.

In addition to support, a child's compensable injuries include the loss of nurture and guidance caused by the death of a parent."[192] Wrongful death damages include the injury "which a child suffers from the loss of the training and instruction which it is entitled to receive from its parents."[193] Thus, Plaintiff's daughter is entitled to damages for the loss of Erika's nurturing, companionship, training, instruction, and guidance.

*Plaintiff may recover for pre-judgment interest that runs from the date of death.* Interest for a wrongful death claim runs from the date of death, not the date of the verdict. "Interest upon the principal sum recovered by the plaintiff from the date of the decedent's death shall be added to and be a part of the total sum awarded."[194] "Furthermore, it has long been the rule in New York

---

[189] *Torres v. Hyun Taik Cho*, 902 N.Y.S.2d 781, 783–84 (N.Y. Sup. Ct. 2010); *Haspil v. Church of St. Cyril*, 491 N.Y.S.2d 914, 917 (N.Y. Sup. Ct. 1985) (a spouse's loss of consortium claim is derivative of the injured spouse's negligence action to the extent that the tortfeasor's liability to the injured spouse is established).

[190] *Grunwald v. Bon Secours Charity Health Sys. Med. Grp*, P.C., No. 18-cv-3208 (NSR), 2020 U.S. Dist. LEXIS 80222 at *10, 2020 WL 2192683 (S.D.N.Y. May 6, 2020) (internal quotes omitted).

[191] *Millington v. Se. Elevator Co.,* 22 N.Y.2d 498, 502 (N.Y. 1968).

[192] *In re Estate of Feld*, 582 N.Y.S.2d at 923–24 (citing *Tilley v. Hudson Riv. R. R. Co.,* 24 NY 471, 475–76 (N.Y. 1862).

[193] *Id.*

[194] N.Y. EST. POWERS & TRUSTS LAW § 5-4.3; *Toledo v. Iglesia Ni Christo*, 18 N.Y.3d 363, 367–68 (N.Y. 2012) ("prejudgment interest in a wrongful death action is part of the damages, and that such interest should run from the date of death to the date of verdict") (internal quotes omitted).

that the damages on a wrongful death action are due on the date of the death of the plaintiff's decedent. Future damages are thus a debt owed entirely as of the date of liability—the date of death—and such damages award properly should include pre-judgment interest calculated from the date of death."[195]

### 2.   Plaintiff's damages are recoverable under New York law.

Defendants make an improper summary judgment argument regarding the weight of the evidence that the jury will ascribe to the competing opinions. This is not a proper argument for summary judgment. When a party "tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court."[196] Defendants claim the possibility of Erika's return to work is "not inferable from the evidence."[197] This is contrary to the evidence.

Erika had no detectable cancer in her body at the time of her death.[198] This fact is uncontroverted. Plaintiff's Response to Defendants' 56.1 Statement of Facts details Erika's excellent response to Pembro, the result of which was that Erika remained cancer-free for nearly two years prior to her death.[199]

Erika died on August 23, 2019, during a liver transplant operation. The transplant was necessitated by the irreparable damage and ensuing liver failure caused by the ablation performed by Dr. Sofocleous 28 months earlier, making it impossible to know how much longer she would have remained cancer free; considering that she had survived stage IV colorectal cancer for 5-1/2 years and was cancer free for the last 2-1/2 years of her life, the odds were in her favor.[200]  If she had not needed a liver transplant, there is not a single person who can definitively say how long she would have remained cancer free, but that is a question for the trier of fact.

---

[195] *Toledo*, 18 N.Y.3d 363 at 367–68.
[196] *I.M. v. United States*, 362 F. Supp. 3d 161, 194 (S.D.N.Y. 2019).
[197] Doc. 229 (p. 30).
[198] **Ex. 15**, Deposition of Dr. Neil Theise (Tr. 61:18–21).
[199] **Ex. 23**, Deposition of Dr. Charles Lopez (Tr. 33:14–34:1); **Ex. 11**, Kemeny Emails_007; *see also* **Ex. 17**, Deposition of Dr. Nancy Kemeny (Tr. 161:8–162:17).
[200] **Ex. 23**, Deposition of Dr. Charles Lopez (Tr. 33:14–34:1); **Ex. 11**, Kemeny Emails_007; *see also* **Ex. 17**, Deposition of Dr. Nancy Kemeny (Tr. 161:8–162:17); **Ex. 3**, ZAK_NY 001002–03; Deposition of Dr. Skye Mayo (45:3–16); **Ex. 15**, Deposition of Dr. Neil Theise (Tr. 61:18–21).

People live with cancer while continuing to go about their lives, including work, every day. How long the disease control would last, and Erika would remain cancer free, is a question of fact for the jury. Thus, Dr. Smith does not assume that Erika would have "lived and worked until the age of 80." As Dr. Smith stated, he assumed "losses in each and every year in the future for as many years as the trier of fact would like to account for it. I don't have an opinion about how long the trier of fact -- to what year they should award wages."[201]

There is a genuine issue of material fact such that a jury could find that if Erika's liver had not sustained such irreparable damage from the April 10, 2017, ablation, Pembro would have continued to provide sufficient disease control such that she could have return to her normal life, including work. After all, immediately prior to the ablation in April 2017, she was nearly there.

3. **There is a genuine issue as to loss of household services.**

Prior to her death, Erika handled most of the household services, such as cleaning, laundry, cooking, and gardening.[202] Due to a disability, Scott Powers did not work outside of the home. He helped care for their daughter.[203] Caring for their daughter also came with its own set of responsibilities but did not negate the services provided by Erika.[204] Defendants recognize there is competing evidence concerning who performed household services; in other words, a question of fact for the jury.

4. **There is a genuine issue of material fact as to recovery of funeral expenses.**

Defendants' claim that Plaintiff has not provided "any proof" of funeral expenses is untrue.[205] Scott Powers testified that he incurred funeral expenses, he simply did not know the exact total offhand.[206] This is yet another argument regarding the weight of Plaintiff's evidence, not its sufficiency. To set this to rest, Scott Powers has submitted a declaration regarding funeral

---

[201] **Ex. 29**, Deposition of Stan Smith (Tr. 81:22–83:7).
[202] Doc. 229 (p. 31).
[203] Doc. 229 (p. 31).
[204] **Ex. 29**, Deposition of Dr. Stan Smith (Tr. 80:12–24).
[205] *See* Doc. 229 (p. 31).
[206] **Ex. 1**, Deposition of Scott Powers (Tr. 44:23–25).

expenses attached as an exhibit to this response.[207] There is a genuine issue of material fact such that a jury could find that Plaintiff is entitled to damages for funeral expenses.

Respectfully submitted,

**Hendler Flores Law, PLLC**

Scott M. Hendler
Laura Alexandra Goettsche

901 S. MoPac Expressway
Bldg 1, Ste 300
Austin, TX 78746
Tel: 512-439-3202
Fax: 512-439-3201
shendler@hendlerlaw.com
lgoettsche@hendlerlaw.com

To: via ECF

Betsy D. Baydala
Andrew S. Kaufman
*Attorneys for Defendants*

KAUFMAN BORGEEST & RYAN LLP
120 Broadway, 14th Floor
New York, NY 10271
Telephone: (212) 980-9600
Fax: (212) 980-9291
bbaydala@kbrlaw.com
akaufman@kbrlaw.com

---

[207] **Ex. 14**, Declaration of Scott Powers.